UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2007-HE3 by HSBC BANK USA, NATIONAL ASSOCIATION, in its capacity as Trustee, | 13 CV 1869 |
| | Civil Action No. _____ |
| Plaintiff, | |
| -against- | COMPLAINT |
| | JURY TRIAL DEMANDED |
| DB STRUCTURED PRODUCTS, INC., | |
| Defendant. | |

Plaintiff ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3 (the "Trust"), by and through HSBC Bank USA, National Association, in its capacity as trustee (the "Trustee"), and its attorneys, Holwell Shuster & Goldberg LLP, and at the direction of certain holders of residential mortgage-backed securities issued by the Trust, as and for its Complaint against DB Structured Products, Inc. ("DBSP" or the "Defendant"), states and alleges as follows:

## NATURE OF ACTION

1.      This action arises out of DBSP's breaches of contract relating to a pool of mortgage loans (the "Mortgage Loans") that DBSP securitized and sold to the Trust, and from which the certificates issued by the Trust (the "Certificates") derive their value.  As the "sponsor" of the securitization, DBSP, among other things, played the critical role of selecting the approximately 3,386 Mortgage Loans that are the primary source of revenue for payments on, and that also collateralize, the certificates issued by the Trust.  To ensure that the Certificates would be marketable securities, DBSP (*i*) made numerous representations and warranties concerning the origination and characteristics of each and every one of the Mortgage Loans, and (*ii*) upon discovery of any material breach, undertook to cure the breach, or if not cured within a

1

specified number of days, to repurchase the Mortgage Loan or substitute a non-breaching loan. As has now become clear, DBSP breached these representations and warranties on the day it executed the agreements containing them, and it has since breached its continuing covenant to cure, substitute, or repurchase the breaching Mortgage Loans.

2.      After an exhaustive (and expensive) loan-by-loan forensic review and a data review (including with respect to payment defaults) initiated by an investor in the Trust's Certificates, the Trustee received several notices indicating that a massive number – an aggregate of at least 1,033 – of the Mortgage Loans breached DBSP's representations and warranties, which breaches materially and adversely affected the value of the loans or the interests of the Trust or the holders of Certificates (the "Certificateholders") in such loans.  Upon receiving each notice, the Trustee promptly notified DBSP of the breaches specified therein, furnishing it with considerable loan-level supporting detail – despite no obligation to do so – and demanding that DBSP fulfill its obligations to cure the breaches or repurchase the loans.  DBSP has failed to do so.

3.      On information and belief, DBSP performed due diligence on the Mortgage Loans before acquiring them for the securitization, and had discovered at the time of the securitization that large numbers of the Mortgage Loans failed to satisfy its representations and warranties.  At that time, DBSP was required to cure the breaches, substitute in non-breaching loans of equivalent value, or repurchase the breaching Mortgage Loans.  It failed to do so.

4.      Even after receiving exhaustively detailed descriptions of each of the breaches from the Trustee, DBSP has failed to cure a single breach or repurchase a single loan.  Left with no other option, the Trustee now brings this action.  DBSP's conveyance to the Trust of a massive number of breaching Mortgage Loans, its breaches of its representations and warranties,

and its failure and refusal to comply with its covenant to cure the breaches or repurchase the Mortgage Loans defeat the fundamental purpose of the relevant agreements and entitle the Trust to rescissory damages, breach of contract damages, specific performance, and reimbursement of the substantial expenses the Trustee has been forced by DBSP to incur in enforcing the Trust's rights and in bringing this action.

5.      DBSP's breaches go to the very heart of the relevant agreements.  Among other things, its representations and warranties concerning the Mortgage Loans played a central role in allocating risk between DBSP and the Trust.  By making dozens of representations and warranties relating to the characteristics and risk profile of the Mortgage Loans and promising to cure or repurchase breaching Mortgage Loans, DBSP assumed the risk that the loans it selected for securitization, and into which it had unique access and insight, failed to have the represented characteristics or carry the represented risk profile.  DBSP's representations, warranties, and promises were made for the benefit of the Trust and investors.  Without DBSP's contractual promises and undertakings, which were in general terms standard requirements in mortgage loan securitizations, the Certificates would not have been marketable, and investors would not have supplied, in purchasing the Certificates, the hundreds of millions of dollars that not only paid the fees of DBSP and its affiliates, but also enabled DBSP to securitize the Mortgage Loans and sell them to the Trust.[1]

6.      The following are but a few of the representations and warranties made by DBSP:

- "No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person . . . or in the application of any insurance in relation to such Mortgage Loan";

---

[1] According to the Prospectus Supplement for this deal, the Depositor offered $587,724,000 of Certificates;  the proceeds paid to the Depositor were 99.09% of that amount, or $582,375,711.60, minus expenses.

- "There is no material default, breach, violation event or event of acceleration existing under the Mortgage or the Mortgage Note . . . .";[2] and

- "The Mortgage Loans were underwritten in accordance with the related originator's underwriting guidelines in effect at the time the Mortgage Loans were originated (the 'Applicable Underwriting Guidelines'), except with respect to certain of those Mortgage Loans which had compensating factors permitting a deviation from the Applicable Underwriting Guidelines;"[3]

7.     These, and other, representations and warranties were not mere contractual boilerplate: they were essential contract terms, without which the Certificates would not have been marketable.  In transferring at least 1,033 loans to the Trust that breached these and other representations and warranties, and later refusing to actually cure, substitute, or repurchase them, DBSP fundamentally altered the bargain struck in the governing documents.  A core feature – if not *the* core feature – of that bargain was that DBSP, not the Trust or investors, should bear the risk of defective Mortgage Loans.

8.     One of several reasons why DBSP assumed the risk of defective loans is that DBSP had unique insight into and information concerning the Mortgage Loans – information that was not available to investors or the market at large.  *First,* DBSP had direct contact with the mortgage loan origination company from which it purchased the loans for inclusion in the securitization.  *Second,* DBSP selected the loans it wished to securitize.  *Third,* DBSP had unrestricted access to the documentation associated with each loan (the "Loan Files") and was

---

[2] Defaults under the Mortgage or Deed of Trust include the provision by the borrower of inaccurate information concerning the borrower's income, employment, indebtedness, and place of residence.  Example language includes: "Borrower shall be in default if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan . . . ."

[3] For each defective loan discussed herein, compensating factors were not documented, did not exist, or were inadequate.  *See infra* at note 13.

free to review this documentation as it wished, and upon information and belief, did review this documentation in sufficient detail to put itself in a position to make specific and wide-ranging representations and warranties concerning each and every one of the loans.

9.      Given its unique vantage point as the securitization sponsor with control over which loans were selected for securitization and with access to the underlying information pertaining to such loans, DBSP was the *only* transaction party that was in a position to accept the risks associated with defects in the Mortgage Loans, including the underwriting process itself. Moreover, it was market practice for responsible parties – such as the securitization sponsor – to accept those risks, and DBSP did so.  Specifically, DBSP assumed the risk that the Mortgage Loans were originated in violation of the applicable mortgage loan underwriting standards, were fraudulently originated, involved borrower misrepresentation (and outright deception), or breached any other representation or warranty.

10.      The cure/repurchase remedy the parties provided for clearly contemplated that breaching Mortgage Loans would be few in number and that remedying the breaches via the cure or repurchase remedy would be a streamlined procedure.  Thus, the Mortgage Loan Purchase Agreement (the "MLPA")[4] provides that, upon discovery of a breach or receipt of a breach notice, DBSP "*shall* . . . cure such defect or breach in all material respects or, in the event [DBSP] cannot . . . cure such defect or breach, [DBSP] shall, within ninety (90) days of its discovery *or* receipt of notice of . . . any such breach . . . repurchase the affected Mortgage Loan at the Purchase Price."[5]  MLPA § 7(a) (emphases added).  DBSP thus agreed that (*i*) its own

---

[4] DBSP's representations, warranties and promise to repurchase are contained in the MLPA and incorporated into the Pooling and Servicing Agreement (the "PSA," as defined herein).  Copies of the MLPA and PSA are attached hereto as Exhibits 1 and 2, respectively.

[5] For a limited period of time after closing, the MLPA and PSA also permitted DBSP to replace any such affected Mortgage Loan with a qualified substitute loan.

discovery of a breach or receipt of a simple notice triggers its cure/substitution/repurchase obligation; and (*ii*) only the most basic information identifying defective loans and the fact that there are breaches of representations or warranties need be included in any breach notice.

11.     On information and belief, DBSP conducted its own due diligence on the Mortgage Loans in connection with their acquisition and thereby discovered a material number of breaches on Mortgage Loans subsequently identified by the forensic review conducted by a Certificateholder (the "Forensic Review"), as well as an additional analysis by the same Certificateholder of loan payment data with respect to the obligation to repurchase Mortgage Loans that were subject to payment related defaults on the date the applicable representations and warranties were made (the "Data Review") (together with the Forensic Review, the "Reviews").  In aggregate, the Reviews revealed that at least 1,033 Mortgage Loans breached DBSP's representations and warranties.[6]  More than 72 percent of the Mortgage Loans subject to the Forensic Review – 994 out of 1,375 Mortgage Loans – breached DBSP's representations and warranties.  Another 39 Mortgage Loans subject to the Data Review also breached DBSP's representations and warranties.  In all, the Reviews uncovered approximately 4,548 separate breaches, most of which involved inaccuracies as to such core matters as borrower income, employment, intended occupancy of the subject property, and other indebtedness.  In other words, the Reviews determined that borrowers or others involved in the origination process

---

[6] The Forensic Review examined 1,375 Mortgage Loans (from Group II) with an original principal balance of approximately $296,694,303.  In aggregate, the Reviews uncovered breaches with respect to a combined 1,033 breaching Mortgage Loans (from Group II) with an original principal balance of approximately $227,495,480, although there was some degree of overlap: (i) there were 758 Mortgage Loans with an original principal balance of approximately $161,325,467 reflecting only breaches uncovered by the Forensic Review; (ii) 236 Mortgage Loans with an original principal balance of approximately $57,344,619 were identified with both breaches uncovered by the Forensic Review and payment default breaches uncovered by the Data Review; and (iii) 39 Mortgage Loans with an original principal balance of approximately $8,825,394 reflected a payment default breach only uncovered by the Data Review.

provided inaccurate information concerning borrowers' debt, income, employment, occupancy status, and other matters that breached DBSP's representations and warranties.

12.     Upon information and belief, DBSP conducted its own due diligence of the Mortgage Loans in connection with their acquisition and thereby discovered a material number of breaches subsequently revealed by the Reviews.  In fact, upon information and belief, DBSP did discover the breaches, or many of them.  DBSP's discovery of the breaches carried through to the closing of the securitization transaction and beyond that date, such that DBSP had an obligation on day one to cure the breaches, substitute non-breaching loans for the breaching loans, or repurchase the breaching loans.

13.     Moreover, the parties' agreements make crystal clear that, whether or not it had discovered breaches when it made its representations and warranties, having been notified of the breaches by the Trustee, DBSP was required to cure the breaches or repurchase the breaching loans.[7]

14.     In contrast to the myriad obligations imposed on DBSP, neither the Trust, the Trustee, nor any Certificateholder was required at any time to verify the accuracy of DBSP's representations and warranties or to determine whether any of them had been breached.  The Certificateholder caused the Reviews to be performed at its own initiative and at its own initial expense, despite having no obligation to do so.  Indeed, the agreements provide that any failure by the Trust or the Certificateholders to conduct a "review and examination of loan files or other documents evidencing or relating to the Mortgage Loans" shall not impair or otherwise render

---

[7] Because DBSP's discovery of the breaching Mortgage Loans was within two years of the securitization's closing date, DBSP originally had the option to substitute for the breaching loans – an option now lost.

unenforceable DBSP's representations and warranties concerning the Mortgage Loans. MLPA § 7(a).

15.     The massive number of defective loans that DBSP sold to the Trust far exceeds anything contemplated by the agreements. A handful of defective loans (together with a handful of cures, substitutions, or repurchases) in a pool of 3,386 mortgage loans is perhaps to be expected. At least 4,548 breaches on at least 1,033 defective loans, many of which DBSP discovered prior to closing, are not. DBSP's conveyance of a Mortgage Loan pool permeated with breaching loans, and its failure to cure, substitute, and/or repurchase, are all fundamental, willful, and intentional breaches of the parties' agreements.

16.     DBSP's fundamental and willful breaches did not end with its conveyance to the Trust of breaching Mortgage Loans in vast numbers. DBSP thereafter failed to perform its cure and repurchase obligations even when the Trustee provided DBSP with notice of its breaches. Indeed, far from curing or repurchasing the entire array of breaching loans – which would have meant repurchasing a substantial portion of the Mortgage Loan pool – DBSP has refused to repurchase even a single loan. While DBSP has acknowledged in writing that 59 of the Mortgage Loans appear to be in breach, and agreed to repurchase those loans, it has subsequently reneged on this written promise, further repudiating its obligations.

17.     DBSP's breaches of contract are so numerous, fundamental, and substantial that they frustrate and defeat the central purpose of the parties' agreements. Without DBSP's representations, warranties, and promises to cure or repurchase, ratings could not have been assigned to the Certificates, investors could not have evaluated potential investments, transaction parties could not have signed on to the deal, and DBSP itself could not have effected a securitization that produced staggering dollar amounts of sales proceeds. Without these

contractual commitments, based on market custom and practice, there would not have been a securitization.  And while a handful of breaches of these commitments might have come within the parties' expectations (along with the cure, substitution, and/or repurchase of that handful of loans), the cumulative effect of more than 4,548 breaches on at least 1,033 loans completely upsets the reasonable expectations of the parties and renders unrecognizable the original securitization.  Indeed, such numerous breaches make recourse to the repurchase remedy impractical because it was never designed to resolve disputes over more than a handful of loans. Because the very essence of the investors' bargain has been irrevocably altered, the Trustee is entitled to rescissory damages.

18.     In the alternative, even if DBSP's breaches are not adjudged as a whole to be so fundamental as to warrant the award of rescissory damages on the transaction, each breach by DBSP of a representation and warranty regarding a specific Mortgage Loan is actionable by the Trustee herein, as is DBSP's breach of its cure, substitution, and repurchase obligations, and each such breach entitles the Trust to compensatory damages.

19.     In the alternative, the Trust is entitled to specific performance of DBSP's obligation to cure or repurchase the breaching Mortgage Loans and any other Mortgage Loans identified as being in breach of DBSP's representations and warranties.

20.     In addition to the remedies sought with respect to DBSP's breaches of the parties' agreements, the Trust is further entitled to, and seeks herein, a declaration that DBSP is required to reimburse the Trustee for all costs and expenses incurred in enforcing the Trust's rights, including, but not limited to, attorneys' fees and costs.

## PARTIES

21.     HSBC is a national banking association.  HSBC's registered main office is in McLean, Virginia and its principal executive office is in New York, New York.  HSBC

participates in this action solely in its capacity as Trustee of the Trust, and not in its individual capacity. HSBC serves as the Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3, which is a securitization trust created pursuant to the Pooling and Servicing Agreement dated as of February 1, 2007 (the "PSA"). The Trust itself is not a juridical entity. The PSA was and is governed by New York law.

22.     HSBC, acting solely in its capacity as Trustee and on behalf of the Trust, has undertaken the conduct of this litigation pursuant to the direction of certain Certificateholder(s).

23.     Upon information and belief, Defendant DBSP is a corporation organized under the laws of the State of Delaware, with its principal place of business at 60 Wall Street, New York, New York. DBSP acted as the Sponsor for the Trust and is owned and controlled by Deutsche Bank, AG, a German corporation with its principal place of business in Frankfurt, Germany.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of costs, exceeds $75,000. For diversity purposes, a national banking association's citizenship is determined solely by the state of its main office.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant's principal officers are within this judicial district. Additionally, the Trust was formed under New York law and DBSP made the relevant representations and warranties, and undertook the relevant obligations, in agreements expressly governed by New York choice-of-law clauses.

## FACTUAL ALLEGATIONS

**I.      RMBS Securitizations Generally**

26.     A securitization of residential mortgage loans is a structured finance transaction. Generally, in such a securitization, the following transfers happen contemporaneously (and sometimes simultaneously) so that mortgage loans can be sold and money can be raised to pay for such loans:  (*i*) the securitization's sponsor purchases a large number of mortgage loans from one or more mortgage loan originators (or mortgage loan underwriters); (*ii*) the sponsor sells the loans to a special purpose vehicle known as a "depositor," typically a bankruptcy-remote, limited purpose entity, which may have been created by, or is affiliated with, the sponsor purely to effectuate such securitizations; (*iii*) the depositor sells the "pool" of mortgage loans to a trust entity and "deposits" the loans into that trust; (*iv*) the trust, another special purpose entity, issues securities, known as "certificates" or residential mortgage-backed securities ("RMBS"), for sale to investors, which it conveys to the depositor in exchange for the loans; (*v*) the depositor sells certificates to an underwriter in exchange for cash, which the underwriter has received from investors; and (*vi*) the depositor uses that cash to pay the sponsor for the mortgage loans.

27.     The trust, and the trustee on behalf of the trust, holds those loans for the benefit of the holders of the certificates.  The following diagram illustrates this typical arrangement:



28.     RMBS are only as good as the mortgage loans underlying them.  The characteristics and risk profiles of those mortgage loans drive the capital structure of the securitization, including the interest rates the certificates pay, the prices and principal balances of certificates that can be issued with the highest rating (and accordingly, the lowest interest rate), and the extent of protections or credit enhancement built into the securitization (*e.g.*, extra cash reserves or subordinate securities that will bear losses first).  Of course, loans that appear less risky translate to higher sales proceeds for the seller.

29.     RMBS also derive their value and marketability from the underlying mortgage loans because the source of the payment stream on the RMBS is the cash flows generated by those loans.  As borrowers make payments on the underlying mortgage loans, those funds are

"passed through" to investors holding the RMBS. Investors receive distributions in accordance with related securitization documents.

30.     Because promised payments on RMBS are based on the cash flow from the mortgage loans, the value of the RMBS is directly contingent on, among other things, the characteristics and quality of the mortgage loans, including the mortgage loans' underwriting process, the creditworthiness of the applicable borrowers, and the information provided by the borrowers when obtaining the mortgage loans. For residential mortgage loans, this information is usually contained in a loan file, which includes information the originator accumulates and analyzes while underwriting and issuing the loans. The loan origination and servicing files generally are available to the sponsor, which is responsible for, among other things, selecting which loans to include in the securitization.

31.     Typically, the sponsor performs some form of review of the loan origination files and is well acquainted with the characteristics of the loans. Critical information about the characteristics of the mortgage loans is contained in the loan origination files that the mortgage originator developed while originating the loans. Each file typically contains the borrower's application for the loan and documents with statements attesting to various matters specified therein, including the borrower's income, assets, debts, and employment. The file also includes the borrower's credit reports, an appraisal of the property that will secure the loan, and statements concerning the borrower's intent to occupy (or not occupy) the mortgaged property. Finally, the file also typically contains the record of the originator's investigation of documents and information provided by the borrower, as well as the detailed notes of the underwriter setting forth the rationale for advancing credit to the borrower.

32.     The loan files are not, however, generally available to investors in the RMBS prior to purchase.[8] Instead of loan files, which are voluminous and contain confidential material, investors typically are provided with mortgage loan data and representations and warranties, each of which is intended to contain numerous characteristics of the mortgage loans.

33.     In addition to the quality of the loans themselves, certain characteristics of a securitization are essential to their marketability in the primary and secondary markets, including: (*i*) the contractual right to payment (among other contractual rights) embedded in transaction documents; (*ii*) representations, warranties, and covenants of the institutions that participate in the RMBS market (including sponsors such as DBSP); (*iii*) the perceived ability and intention of those institutions to live up to their contractual obligations; and (*iv*) the assignment of responsibilities to transaction parties pursuant to the transaction documents. Among other things, these essential characteristics allow ratings to be assigned to RMBS investments.

34.     The relevant agreements in a RMBS securitization typically include a mortgage loan purchase agreement (or similar document), which provides for the sale of the loans by the sponsor to the depositor and contemplates the transfer of the loans by the depositor to the trust, and a pooling and servicing agreement, which among other things provides for the transfer of the loans by the depositor to the trust and establishes the trust itself. Representations and warranties by a responsible party concerning the mortgage loans are generally set forth in one or both of those agreements. Invariably, the pooling and servicing agreement and mortgage loan purchase agreement make it clear that the responsible party – here, DBSP, the Sponsor – is solely

---

[8] Indeed, even after purchase, investors only receive the right to request access to the loan files and only then if they can gather sufficient voting rights from their fellow investors, a process that can require substantial and significant effort by certificateholders.

responsible for the risk of inaccuracies in its representations and warranties concerning the mortgage loans.

35.    The typical pooling and servicing agreement and mortgage loan purchase agreement further provide what is intended to be a straightforward commercial procedure should any mortgage loan breach the responsible party's representations and warranties. Essentially, when the responsible party discovers a breach with regard to a specific mortgage loan, the responsible party is required either to cure the breach within a short time period, typically 60 to 90 days, or to replace or repurchase the breaching mortgage loan within a similarly short time period, typically 90 days.

36.    The procedure set forth in the parties' agreements for the responsible party to cure or repurchase a mortgage loan that breaches the representations and warranties is intended to benefit the trust (and therefore investors) by providing for a straightforward, streamlined commercial remedy for the sponsor's conveyance to the trust of a mortgage loan that does not meet the requirements set forth in the representations and warranties. In fact, the process is intended to be incredibly simple. Once it discovers or is notified of a breach of a representation and warranty, the responsible party is contractually obligated to cure the breach or repurchase the mortgage loan. For example, if a borrower had fraudulently misrepresented his/her debts on his/her loan application, such misrepresentation would be a breach of, at least, a "no material default" and/or "no fraud" representation. Because the past cannot be changed – *i.e.*, the borrower cannot retroactively wipe out the undisclosed debts as of the time of the loan, the responsible party must either cure the breach or repurchase the loan. This no-frills procedure is consistent with the fact that, prior to the closing of the transaction, the responsible party had access to the loan file and the ability not to include such a loan in the securitization.

37.     The streamlined time period for the responsible party to remedy its breach also reflects the trust's, trustee's and certificateholders' reasonable expectation that breaching loans will be few in number, that breaches can be quickly and efficiently addressed, and that a trust should not be put in the position that this Trust has been – forced to demand the repurchase of at least 1,033 loans by the Sponsor and then forced to sue because the Sponsor has frustrated any effort by the Trust to enforce the contractually provided-for commercial remedy.

## II.     The ACE 2007-HE3 Securitization

38.     DBSP was the Sponsor of the securitization at issue here.  As such, after selecting approximately 3,386 mortgage loans that it acquired from a third-party originator, ResMAE Mortgage Corporation ("ResMAE'), DBSP resold those mortgage loans to the depositor, an entity called ACE Securities Corp. ("ACE' or "Depositor").  The Depositor purchased the loans pursuant to the Mortgage Loan Purchase Agreement dated March 22, 2007, in which DBSP was identified as the "Seller" and ACE as the "Purchaser."  The Depositor/Purchaser purchased the loans for the express purpose of selling them to, and depositing them into, the Trust, which was accomplished pursuant to a Pooling and Servicing Agreement dated as of February 1, 2007.

39.     The ACE 2007-HE3 securitization was very similar to the typical securitization described above.[9]  The Mortgage Loans were sold by the Sponsor to the Depositor at a specific price.   The Depositor transferred the Mortgage Loans to the Trust in exchange for the Certificates.   As set forth in the Prospectus Supplement relating to this deal, the aggregate principal balance of the Mortgage Loans sold to the Trust was approximately $615,416,605 as of the "Cut-off Date" (a date prior to the deal's Closing Date).  Publicly-offered Certificates with an

---

[9] For ease of reference,  attached as an Appendix is the diagram of the ACE 2007-HE3 securitization structure that appears in the Prospectus Supplement.

aggregate face value of approximately $587,724,000 were issued by the Trust and were transferred to the Depositor. Pursuant to an underwriting agreement, the Depositor raised cash by selling those Certificates to Deutsche Bank Securities Inc., another member of the Deutsche Bank corporate family, which then sold those Certificates to investors in exchange for cash (and which received corresponding underwriting fees). The Depositor applied the net proceeds from the sale of those Certificates (as described in the Prospectus Supplement relating to the deal) against the purchase price of the Mortgage Loans it bought from DBSP. Accordingly, DBSP, together with one or more of its affiliates, caused the Certificates to be issued and sold to investors so that it could be paid for its Mortgage Loans.

40. Pursuant to the PSA, the Trust holds the Mortgage Loans for the benefit of investors in the Certificates, who ultimately bear the economic consequences of the Mortgage Loans' performance or lack of performance. The value of the Mortgage Loans, and consequently of the Certificates issued by the Trust, was and is directly contingent on, among other things, the loans' characteristics, quality and risk profile.

41. DBSP, as sponsor of the securitization and as seller of the Mortgage Loans to the Depositor, and therefore ultimately to the Trust, made a series of representations and warranties in the MLPA concerning the characteristics, quality, and risk profile of the Mortgage Loans. Those representations and warranties were and are an integral component of the securitization and therefore a critical factor in determining the value of the Mortgage Loans and the Certificates. Upon information and belief, DBSP conducted due diligence on Mortgage Loans and accompanying loan origination and servicing files before making these representations and warranties. Upon information and belief, this due diligence involved a thorough review of

documentation relevant to each and every Mortgage Loan in relation to each representation and warranty, or, at a minimum, a significant sample of the Mortgage Loans in the Trust.

42.     If any of those representations and warranties was breached with respect to any Mortgage Loan and such breach materially and adversely affected the value of the Mortgage Loan or the interests of the Trust or Certificateholders in such Mortgage Loan, DBSP promised to cure such breach or, if such breach was not cured, to repurchase the related Mortgage Loan. DBSP further agreed to certain reimbursement obligations, such as the obligation to promptly reimburse the Trustee for any expenses reasonably incurred by the Trustee in respect of enforcing the remedies for such breach. Such covenants were made as part of the consideration for the mortgage loan transfers described herein.

43.     DBSP's representations and warranties regarding the Mortgage Loans and the associated remedies to which it agreed, including cure, repurchase and reimbursement, are the contractual manifestations of the allocation of risk agreed to by the parties to the contracts – that is, DBSP would bear the risk of the inaccuracy of its promises and the Trust would be entitled to be made whole should those representations and warranties be inaccurate (which, unfortunately, they proved to be in many cases). *See, e.g.*, DBSP's Form ABS-15G filed on May 15, 2012, available at www.sec.gov. In fact, DBSP's representations and warranties (and the associated remedies) were so essential to the effectuation of the securitization that DBSP even agreed to cure, substitute, or repurchase loans breaching representations and warranties qualified by its knowledge, even when it had no such knowledge.

**III.  Reviews Revealed Breaches of DBSP's Representations and Warranties So Extensive As to Defeat the Very Purpose of the MLPA and PSA**

44.     Prior to commencement of this action, a Certificateholder caused an independent firm to be retained to conduct a forensic review with respect to a total of 1,375 Mortgage Loans in the Trust.

45.     In such a forensic review, sometimes referred to as a loan "re-underwriting," a detailed, item-by-item examination is made of the documents and information contained in each loan file for each Mortgage Loan as to which the review is conducted.  The documents and information are reviewed for their accuracy and compliance with DBSP's representations and warranties.

46.     Here, in connection with the Forensic Review, the Loan Files were provided to a third-party consultant that specializes in examining mortgage loans for compliance with representations and warranties, including applicable underwriting guidelines, and other requirements.  The third-party consultant found numerous, fundamental breaches of DBSP's representations and warranties that materially and adversely affect the value of the Mortgage Loans or the interests therein of the Trust or Certificateholders, including inaccuracies, outright misrepresentations, material omissions, and other breaches, across the Mortgage Loan pool.  In Loan File after Loan File, core information about the Mortgage Loan characteristics, the borrower, or the property was simply wrong, misrepresented, or otherwise in breach of DBSP's representations and warranties.

47.     The Forensic Review consisted of a thorough analysis of the Loan File for each Mortgage Loan reviewed, including documents submitted by the borrowers in support of their loan application and an analysis of external information and other documentation relating to the borrowers' assets. In addition to this Forensic Review, the Certificateholder also caused its own

review to be undertaken as to loans in which the borrower was in default under the borrower's mortgage note because the borrower had failed to timely make a required payment of principal and/or interest as of the Closing Date.

48.     The Forensic Review did not merely uncover breaches of DBSP's representations and warranties as to individual loans.  Instead, it is now clear based on the Forensic Review that, despite its representations and warranties, DBSP simply placed into the Trust a Mortgage Loan pool that was fundamentally defective – *i.e.*, it contained voluminous breaches that materially and adversely affected the value of the Mortgage Loans or the interest of the Trust or the Certificateholders in the Mortgage Loans.  The numbers tell the story.  The Forensic Review revealed that at least 994 of the 1,375 loan files reviewed – more than 72 percent – breached one or more of DBSP's representations and warranties regarding the Mortgage Loans.  Breaches uncovered in the Forensic Review included widespread misrepresentations of borrower income, misrepresentations of occupancy status, incorrect calculations of debt and debt-to-income ratios, improper calculations of loan-to-value ratios, inclusion of impermissible high cost loans, the provision of inaccurate information with respect to these loans and other breaches.

49.     In addition to above-described Forensic Review, the Data Review revealed that at least 275 Mortgage Loans were in material breach of their payment obligations on the date the applicable representation and warranty was made.[10]  Pursuant to Section 6(xiv) of the MLPA, DBSP represented and warranted that "[t]here is no material default, breach, violation event or event of acceleration existing under the Mortgage or the Mortgage Note . . . ."  Given that the Data Review uncovered approximately 275 Mortgage Loans that were in default and/or in breach of the borrower's primary obligation under the borrower's mortgage note because the borrower

---

[10] The Forensic Review also identified 236 of these Mortgage Loans as having other breaches.

had failed to timely make a required payment of principal and/or interest as of the Closing Date, the repurchase obligation is also triggered with respect to these loans for this sole reason.

50.     In all,[11] the findings from the Reviews revealed numerous breaches, including inaccuracies and outright misrepresentations or material omissions by the borrowers across the Mortgage Loans in the Trust, which caused the loans to violate DBSP's representations and warranties.   The inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident.  In loan after loan, core information about the borrower or the property was simply wrong or glaringly incomplete.   It is now clear that, from day one, the Mortgage Loan pool was filled with fundamentally defective loans.

51.     The whole purpose of DBSP's representations and warranties, and of the cure/substitution/repurchase remedy, was to ensure that the Trust did not ultimately bear the risks associated with so much as a single loan that was in breach of a single one of DBSP's representations and warranties.  Yet, on day one, DBSP placed several thousand defective loans into the Trust, thereby defeating the entire premise of the agreements, of DBSP's representations and warranties, and of the Trust's remedies.  This state of affairs is so far afield from the parties' original agreements as to defeat their very purpose.

A.     **DBSP's Representations And Warranties**

52.     Section 6 of the MLPA sets forth no fewer than 67 individual representations and warranties made by DBSP as Seller/Sponsor concerning the Mortgage Loans sold to the Trust. As already alleged, these representations and warranties were a core element of the securitization

---

[11] *See supra* at notes 6 and 10, describing overlap of Mortgage Loans subject to applicable Breach Notices.

and of the parties' agreements, including without limitation, the agreement by the Trust to purchase the Mortgage Loans.

53.   Section 6 of the MLPA sets forth the representations and warranties concerning the Mortgage Loans sold to the Trust.  Those representations and warranties include, *without limitation,* the following:

> SECTION 6.  <u>Representations and Warranties of the Seller Relating to the Mortgage Loans.</u>
>
> The Seller hereby represents and warrants to the Purchaser that as to each Mortgage Loan as of the Closing Date:
>
> …
>
> (ii)   No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan;
>
> …
>
> (viii) Each Mortgage Loan and the related Prepayment Charge, if any, complied in all material respects with any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, anti-predatory lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, fair lending or disclosure laws applicable to the origination and servicing of the Mortgage Loans and the consummation of the transactions contemplated hereby will not involve the violation of any such laws;
>
> …
>
> (xiv)   There is no material default, breach, violation event or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, and the Seller has not, nor has its predecessors, waived any material default, breach, violation or event of acceleration;
>
> …

(xxiii)  The Mortgage Loans were underwritten in accordance with the related originator's underwriting guidelines in effect at the time the Mortgage Loans were originated . . . , except with respect to certain of those Mortgage Loans which had compensating factors permitting a deviation from the Applicable Underwriting Guidelines;

…

(lxxii)  The information set forth in the Closing Schedule is true and correct in all material respects as of the Cut-off Date;

…

54.     Among the events that qualified as a "material default, breach, violation or event of acceleration" under the documentation for a Mortgage Loan were the borrower making material misrepresentations concerning, among other things, his/her represented income, employment, and other indebtedness.[12]

55.     The PSA incorporates the express representations and warranties set forth in the MLPA and attaches that agreement as an exhibit. *See, e.g.*, PSA §§ 2.01, 2.03.

**B.     DBSP's Breaches Of The Representations And Warranties**

56.     Among other breaches, the Forensic Review uncovered numerous material misrepresentations by the borrowers and conclusive evidence that the Mortgage Loans had not been originated "in accordance with the related originator's underwriting guidelines." MLPA § 6(xxiii).[13] The Forensic Review also revealed numerous material defaults under the mortgage notes and mortgages, including borrower misrepresentations. *Id.* § 6(xiv). Moreover, the Data Review revealed that 275 Mortgage Loans were past due (*i.e.,* in default with respect to the

---

[12] *See supra* at note 2, describing defaults under the Mortgage or Deed of Trust and providing example language of the same.

[13] Underwriting guidelines may provide for "exceptions" when certain "compensating factors" exist. These compensating factors typically include circumstances where one indication of a high-risk loan is offset by other, offsetting information. In all circumstances alleged here, where the Forensic Review uncovered a breach of DBSP's representations and warranties based on violations of underwriting guidelines, it was determined that there were no documented compensating factors or any alleged compensating factors adequate to offset the risk.

borrower's primary obligation under the note) on the Closing Date and, accordingly, breached the applicable default representation.[14] *Id.*

57.     Many of the breaches uncovered by the Forensic Review were based on misrepresentations by the borrowers concerning, among other things, income, employment, and other indebtedness.  The Forensic Review revealed, for example, that in many cases borrowers' listed income was inaccurate or otherwise unreasonable given the borrower's job or employment status and the geographic region where the borrower lived.  The borrower's job or employment status was also frequently misrepresented.  Similarly, the Forensic Review often found that information concerning the borrower's other indebtedness was inaccurate.  Over and over, the Loan Files did not even disclose other mortgage debt from additional recent home purchases.

58.     The Forensic Review also revealed that many of these misrepresentations could have been discovered – with the loan likely being rejected – had the Mortgage Loans been underwritten in accordance with applicable guidelines.   The Forensic Review uncovered numerous instances where income, employment, and other indebtedness had not been adequately verified or where the documentation required by proper underwriting standards was materially incomplete.   These underwriting lapses, intentional or otherwise, also resulted in further misrepresentations or miscalculations of other data critical to risk assessment for the Mortgage Loans.  One such type of data was the debt-to-income ratio (or "DTI"), which compares a borrower's monthly debt obligations to his/her monthly income.  Higher DTIs correlate with greater risk that the borrower will be unable to make good on his/her mortgage loan obligation.  The Forensic Review revealed that, when the true DTIs were calculated, they often exceeded the represented DTIs and/or the maximum ratios approved by the underwriters.

---

[14] *See supra* at notes 6 and 10, describing overlap of Mortgage Loans subject to applicable Breach Notices.

59.     Each noticed Mortgage Loan had at least one breach of a representation and warranty that materially and adversely affected the value of that Mortgage Loan or the interests therein of the Trust or the Certificateholders.

60.     The examples below are illustrative of breaches due to borrower misrepresentations of other indebtedness, intended occupancy status, employment, and income:

- Mortgage Loan Number XXXXX6565: A loan was originated in October 2006 with an original principal balance of $170,400. The borrower failed to disclose all of the properties s/he owned at the time of origination and all the properties s/he was in the process of purchasing, for which purchasing proceedings would have begun, and thus portrayed a false picture of his/her financial obligations. The Forensic Review discovered that, in just over a month prior to origination, the borrower acquired five other properties, including four in the same high concentration investment market, and undertook additional mortgage obligations. The borrower obtained more than $1,000,000 dollars of additional mortgages, with monthly payments exceeding $7,600. None of these properties or debt obligations were reflected in the borrower's loan application. The borrower also failed to disclose all of the properties s/he was in the process of purchasing at the time of origination. In fact, within 30 days of the subject loan closing, the borrower had purchased *another* five properties (four of which were in the same high concentration investment market) and assumed nearly another $800,000 in additional mortgage debt, with monthly payments exceeding $6,400. Further, although the borrower represented on his/her application that the subject property was to be owner-occupied, evidence discovered by the Forensic Review, including driver's license records, show that s/he continued to reside at his/her previous address. Finally, including the borrower's undisclosed mortgage debt results in a DTI of 268.37%, far above the 48.83% permitted by the loan approval or the tape's 50%.

- Mortgage Loan Number XXXXX6564: A loan was originated in October 2006 with an original principal balance of $416,000. The Forensic Review uncovered evidence showing that (1) this was a prohibited straw buyer transaction; (2) there were misrepresentations as to borrower occupancy; (3) there were misrepresentations as to borrower income; and (4) this was a non-arm's length transaction. First, the file shows that the borrower did not purchase the subject property for the borrower's own use, but rather as a foreclosure bailout. The borrower purchased the subject property from the seller in September 2006 and the loan funded in October 2006. Six days after the loan funded, the borrower transferred ownership of the subject property back to the seller. At the time of origination, the seller received a notice of Trustee's sale. The public auction was scheduled for the day before the borrower purchased the property. Second, evidence discovered by the Forensic Review indicated that although the borrower

represented that the subject property would be owner-occupied, the borrower continued to reside in his/her previous address. (This is further supported by the fact that six days after the loan funded, the borrower transferred ownership back to the seller.) Third, the lender approved the loan using a stated income of $9,750 per month, $117,000 per year, for a self-employed truck driver in that geographic area. Although the applicable underwriting guidelines require that the lender assess the reasonableness of the borrower's income, nothing in the loan file indicated that the lender performed any reasonableness test or that any steps at all were taken to assess the reasonableness of the borrower's stated income. In fact, according to U.S. Bureau of Labor Statistics, during the applicable time, the 90th percentile for someone with this employment in this geographic area was $4,175 per month, or $50,100 annually. The DTI at that salary would have been 112.73%, far above the 48.94% maximum permitted by the loan approval. Fourth, the transfer from buyer to seller less than a week after the loan funded indicates that this was not an arm's-length transaction. Additionally, the subject loan originator and real estate firm are affiliated and, at the time of origination, shared a business address and designated officer. The originator received more than $35,000 in fees, commissions, and yield spread from the subject transaction.

- Mortgage Loan Number XXXXX6285: A loan was originated in October 2006 with an original principal balance of $184,000. On the borrower's loan application, the borrower stated that s/he was employed as the supervisor of a towing company and had held that position for 2.3 years. The phone number listed for the towing company, however, was the same as the borrower's home phone number. The loan file contained a verbal verification of employment, but it was from a different employer and a different phone number than that listed in the application. Additionally, the W2 and paystub in the loan file were not from the company listed on the application. The Forensic Review found, based on information from the state's Department of State Division of Corporation Website, that the borrower owned the towing company. Self-employed borrowers were subject to different income verification requirements. The Forensic Review also uncovered evidence of a non-arm's length transaction that was not investigated by the lender. Specifically, the same person acted as the selling agent and the loan officer. The final HUD reflects that almost $13,000 of commission was paid – almost $7,000 to the real estate selling firm and almost $6,000 to the mortgage broker.

61.    Breaches of the representations and warranties in the PSA and MLPA such as these severely undermine the value of the Mortgage Loans and the Certificates they underlie. Among other things, such breaches conceal significant and material increased risks. A borrower's ability to make the required payments of interest and principal on a mortgage loan

depends in significant part upon the borrower's income and employment status. A borrower's debt burden affects the borrower's creditworthiness and ability to make required payments of interest and principal on a mortgage loan. If income is misrepresented as higher than it actually is and debt is misrepresented as lower than it actually is, the risk of missed payments and default grows. If intended occupancy is misrepresented, the risk of missed payments and default also grows, as a borrower of an owner-occupied property is less likely to walk away from the loan and the mortgage property is better maintained (and holds its value better than an otherwise equivalent rental or investment property). Simply put, loans that breach the representations and warranties are riskier than represented.

62.     The breaches revealed by the Reviews were both severe and voluminous. These breaches had a substantial effect on the risks associated with, and value of, each of the affected Mortgage Loans.

63.     Among other things, in many instances borrower income was significantly (and materially) misrepresented to be higher than it actually was, and borrower indebtedness was routinely misrepresented to be lower than it actually was by hundreds of thousands of dollars or more. Underwriting guidelines were brushed aside, with loan originators abandoning minimum verification procedures and therefore leaving open the possibility of even greater risks being concealed. Given the massive number of defective loans, DBSP's own standards for including loans in securitizations were not satisfied for the breaching Mortgage Loans. For each of the Mortgage Loans individually and for the pool of loans as a whole, the breaches were so severe as to change the risk profile for each defective Mortgage Loan, the Mortgage Loan pool, and the Certificates.

64.     Given the number, extent, and nature of the breaches uncovered by the Reviews, it is not commercially plausible that DBSP's own due diligence, conducted, on information and belief, before it even made the representations and warranties, did not reveal the same problems with the Mortgage Loans.  Here, where at least 1,033 of the Mortgage Loans in the pool were riddled with material breaches, due diligence on even a small sample would have alerted DBSP to fundamental problems with the pool.  Accordingly, DBSP delivered to the Trust substantial numbers of Mortgage Loans that failed to conform to the representations and warranties DBSP made to the Trust regarding those loans.

65.     The nature and number of the breaches revealed by the Reviews were sufficient to defeat the very purpose of the MLPA and PSA.  The MLPA and the PSA were executed to deliver to the Trust a fixed and identified pool of loans that individually and as a whole possessed certain characteristics and safeguards.  These characteristics and safeguards were reflected in DBSP's representations and warranties.  The Reviews revealed that at least 1,033 Mortgage Loans did not possess the represented characteristics and safeguards at the time the MLPA and the PSA were executed.  Instead, therefore, of receiving a pool of loans having the characteristics and quality represented by DBSP, the Trust received a far riskier and less stable loan pool.

66.     The breaches materially and adversely affected the value of each of the affected Mortgage Loans or the interests of the Trust or the Certificateholders in those Mortgage Loans.  The breaches in each instance bore negatively upon, among other things, the affected Mortgage Loan's value and riskiness, the borrower's creditworthiness, the likelihood that the borrower could and would make required payments of principal and interest, and the pass-through payments that the breaching Mortgage Loan would generate for Certificateholders.

**IV.**     **The Trustee Provided Timely Notice To DBSP**

67.     Although DBSP's obligations to cure or repurchase are not conditioned on receipt of notice, the Trustee provided prompt notice of the breaches of the representations and warranties.

68.     Section 7(a) of the MLPA states that "[u]pon discovery by the Seller, the Purchaser, or any assignee, transferee or designee of the Purchaser . . . of a breach of any of the representations and warranties contained in Section 6 that materially and adversely affects the value of any Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, the party discovering such breach shall give prompt written notice to the Seller." Section 2.03(a) of the PSA is to a similar effect.

69.     Pursuant to MLPA Section 7(a) and PSA Section 2.03(a), the Trustee advised DBSP of the specific breaches identified by the Reviews in letters dated November 21, 2011 (the "November 21 Breach Notice"), January 30, 2012 (the "January 30 Breach Notice"), and November 28, 2012 (the "November 28 Breach Notice") (together, the "Breach Notices").

70.     In connection with the November 21 and the January 30 Breach Notices, the Trustee, even though not required to do so, attached information *for each individual Mortgage Loan as to which a breach had been identified*, including the loan number, the specific representations or warranties breached, the section number of the MLPA in which such representations or warranties are set forth, and a description of the breaches setting forth the facts and circumstances giving rise to and evidencing the breaches and the breaches' material and adverse effect on the value of the Mortgage Loan or the Trust's and Certificateholders' interest therein. This support also included ample loan documentation, including the relevant documents from the loan files, such as appraisals, employment verifications, asset statements, and other documents used in the underwriting of the Mortgage Loans. Furthermore, without having any

obligation to do so, with a letter dated June 14, 2012, the Trustee forwarded DBSP the complete origination and servicing files for the Mortgage Loans identified in the November 21 and January 30 Breach Notices.

71.     With respect to the November 28 Breach Notice relating to payment defaults, the Trustee (although not required to do so) attached exhibits identifying the breaching Mortgage Loans by loan number, illustrating the delinquency and/or default status of the Mortgage Loans, and charting the payment histories of the breaching Mortgage Loans.[15]     Attached hereto as Exhibit 3 is a list by loan number of the Mortgage Loans that are the subject of the Breach Notices.

72.     DBSP was in breach of its obligations to cure such breaches or repurchase breaching Mortgage Loans within the contractually specified time periods long before it received notice from the Trustee of the breaches uncovered by the Reviews.  In fact, DBSP has taken the position as to its repurchase obligations in another trust involving the same trustee that it is not obligated to repurchase certain categories of loans (even where it previously said it would repurchase those loans).  DBSP's stated rationale for this unilateral waiver would apply to many of the breaching Mortgage Loans identified in the Breach Notices.  DBSP's decision to excuse itself from its obligations is without basis in law or the parties' agreements and is flatly inconsistent with established custom and practice in the industry (including DBSP's own established custom and practice).  Nonetheless, DBSP has made it clear here and in other instances that it will not repurchase the loans.

---

[15] Each of the Mortgage Loans identified in the November 28 Breach Notice was past due (*i.e.*, in default and/or breach with respect to the borrower's primary obligation to pay under the note and security agreement) and therefore breached, among other provisions, Section 6(xiv) of the MLPA.

73.     As to each of the 1,033 loans identified in the Breach Notices, there were one or more breaches of representations and warranties made by DBSP that materially and adversely affected the value of the Mortgage Loan or the interests of the Trust or the Certificateholders in the loan, and for many there were multiple such breaches.

74.     The information provided by the Trustee to DBSP in the Breach Notices was substantially in excess of that required by contract or law, amounting to thousands of pages of additional material.  Finally, the Trustee sent each of the Breach Notices to DBSP in a timely manner, shortly after receiving the results of the Forensic Review and the results of the Data Review with respect to those Mortgage Loans with payment default breaches.

75.     While DBSP was in a position and required to identify breaches, the Trustee was not in a position to identify breaches of representations and warranties without performing a detailed forensic review of the Loan Files, or any other analysis of the Mortgage Loans, which the Trustee was under no obligation to do.  *See, e.g.*, PSA § 9.03 and MLPA §§ 4(e) and 7(a).

76.     The Breach Notices and supporting documents contained more than sufficient information for DBSP to identify and verify the extensive breaches of its representations and warranties in the MLPA and PSA (noting that many of these breaches could certainly be familiar to DBSP).

## V.     DBSP Breaches Its Cure, Repurchase, And Reimbursement Obligations

77.     Under Section 2.03(a) of the PSA, within 90 days of its discovery of any breach of a representation or warranty, DBSP is contractually required to cure any such breach, or in the absence of cure, to repurchase the affected Mortgage Loan or substitute a loan that conforms to

the representations and warranties.[16]  It has a similar obligation under Section 7(a) of the MLPA. DBSP is further obligated to reimburse the Trustee for any (and all) expenses incurred in connection with enforcing DBSP's obligations pursuant to the PSA and the MLPA.  Yet, despite having discovered many of these breaches even before it executed the relevant agreements, and having received Breach Notices identifying 1,033 breaching Mortgage Loans with some 4,548 breaches, DBSP has failed to cure a single breach or repurchase a single loan.

78.     In Section 2.03(a) of the PSA, DBSP covenanted that "within ninety (90) days" of its discovery, or receipt of notice, of "a breach . . . of any representation, warranty or covenant . . . that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders," it shall cure such breach "in all material respects" and, if such breach is not so cured (*i*) prior to the second anniversary of the Closing Date, replace the breaching Mortgage Loan with a Qualified Substitute Mortgage Loan; or (*ii*) repurchase the affected Mortgage Loan or Mortgage Loans at the Purchase Price.

79.     In addition to Section 2.03(a) of the PSA, Section 7(a) of the MLPA affords an independent basis for the relief sought herein.  As alleged above, the Trustee is entitled to enforce the MLPA directly as the assignee of the Purchaser's rights under that agreement.  The MLPA sets forth substantially similar language to that found in the PSA concerning DBSP's obligations.  The MLPA provides in Section 7(a) that DBSP's cure or repurchase obligation is triggered upon DBSP's discovery of, or receipt of notice of, any "breach of any of the representations and warranties contained in Section 6 that materially and adversely affects the value of any Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee,

---

[16] Note that Section 7(a) of the MLPA (executed by DBSP) states that "[a]ny repurchase required by this Section shall be made in a manner consistent with Section 2.03 of the Pooling and Servicing Agreement" and thus cross-references the repurchase obligations set forth in the PSA.

transferee or designee . . . ."  If DBSP "cannot cure such . . . breach," then DBSP must "repurchase the affected Mortgage Loan" or "cause the removal of such Mortgage Loan from the Trust Fund and substitute one or more Qualified Substitute Mortgage Loans."  MLPA § 7(a).

80.     Despite these provisions, within 90 days of discovering breaches that materially and adversely affected the value of Mortgage Loans or the interests of the Trust or the Certificateholders in the Mortgage Loans, DBSP did not cure any breaches, repurchase any of the breaching Mortgage Loans, or substitute loans conforming to the representations and warranties.  On information and belief, through its due diligence efforts and therefore on or about March 22, 2007 – the closing date of the MLPA – DBSP discovered the breaches subsequently revealed by the Reviews.  This discovery triggered its obligation to cure the breaches, repurchase the breaching Mortgage Loans, or substitute non-breaching loans within 90 days of March 22, 2007.  Because DBSP failed to do so, it breached the cure, substitution, and repurchase obligations shortly after the securitization closed.

81.     DBSP's cure or repurchase obligations were again triggered when it was first advised by the Trustee in November 2011 of applicable breaches of representations and warranties as a result of the Reviews.  Accordingly, within 90 days of the November 21 Breach Notice and each subsequent Breach Notice, DBSP was again required to either cure the breaches identified in each notice or to repurchase the breaching Mortgage Loans.  (The option of replacing breaching Mortgage Loans with Qualified Substitute Mortgage Loans was no longer available as of March 22, 2009, the second anniversary of the Closing Date, which was March 22, 2007.)

82.     Despite receiving notice containing detailed descriptions of breaches it already had discovered, DBSP repudiated and abandoned its obligations to cure breaches or repurchase

breaching Mortgage Loans. Among other things, it refused to repurchase a single breaching Mortgage Loan since receiving the November 21 Breach Notice and subsequent Breach Notices in accordance with the relevant agreements. For all of the 1,033 Mortgage Loans identified in the Trustee's Breach Notices, DBSP's time to actually cure or repurchase these breaching Mortgage Loans has expired. In any case, DBSP was in breach of its obligations to cure such breaches or repurchase such breaching Mortgage Loans long before it received notice from the Trustee. DBSP has repudiated its repurchase obligations in their entirety here and in other instances and has refused to repurchase a single breaching Mortgage Loan since it was first notified of breaches in November 2011.

83.     It was not until September 2012, some eleven months after receiving the Trustee's first Breach Notice, that DBSP first addressed the substance of the Trustee's breach allegations. By letter dated September 12, 2012, DBSP promised to repurchase 59 Mortgage Loans[17], which it acknowledged breached its representations and warranties and were therefore subject to repurchase pursuant to the PSA and the MLPA. DBSP's repurchase promise was unconditional. Nevertheless, DBSP has failed to repurchase those breaching Mortgage Loans.

84.     DBSP's refusal to cure or repurchase the breaching Mortgage Loans is without basis, and itself is a breach of the parties' agreements. Neither the PSA nor the MLPA affords DBSP any discretion in connection with its cure and repurchase obligations. If DBSP discovers or is notified that any Mortgage Loan breaches a representation or warranty, then DBSP is required to cure the breach or repurchase the loan.

---

[17] All but one of the Mortgage Loans that DBSP agreed to repurchase were liquidated or otherwise charged-off loans. The sole exception was a single Mortgage Loan that showed an active balance as of December 1, 2012.

85.  DBSP's obligation to repurchase the breaching loans applies regardless of whether the loans have been liquidated with a loss via foreclosure or "charged off" or otherwise similarly dealt with by the loan servicer.  It is simply not conceivable that any Certificateholder would have invested in the Trust if it had had any idea that Mortgage Loans, including those that had been liquidated, foreclosed, or charged off, that breach representations and warranties would be excluded from DBSP's cure, substitution, or repurchase obligations, and the MLPA and PSA were drafted to reflect that fact.  Of course, when DBSP first discovered the breaches, none of the Mortgage Loans had been liquidated, and hence its obligation to cure, substitute or repurchase was triggered and breached pre-liquidation.  Upon information and belief, DBSP first discovered the breaches and had an obligation to cure, substitute, or repurchase breaching Mortgage Loans long before any actions were taken to mitigate the losses caused by DBSP's breaches.  DBSP also cannot be heard to complain about the promptness of notice received from the Trustee of its breaches when DBSP had discovered those breaches long before the Trustee did and the Trustee provided notice upon its discovery.

86.  Moreover, consistent with DBSP's unequivocal obligations under the PSA and the MLPA, it is established custom and practice in the industry for sponsors to cure or repurchase such loans after liquidation where they have been the subject of subsequent breach notices.  DBSP has itself engaged in this custom and practice.[18]  This established custom and practice is well known to industry participants and is reflected in data available to industry participants and in, among other documents, filings with the Securities and Exchange Commission.  In such cases, the payments in satisfaction of repurchase obligations are

---

[18] DBSP only turned its back on its own custom and practice when the true scope of its liability came to light and it has since repudiated its obligations.

sometimes referred to as "make whole" payments. The parties' agreements, and DBSP's contractual cure or repurchase obligation, should be construed in the light of this custom and practice.

87. Of course, the fact that DBSP kept silent with regard to breaches it had itself discovered and made, that it was necessary to "re-underwrite" and analyze a substantial portion of the Mortgage Loan portfolio sold to the Trust by DBSP, and that the Reviews revealed a minimum of 1,033 breaching Mortgage Loans, are evidence that the underlying framework and purpose of the PSA and the MLPA had been frustrated before the Trustee even sent its Breach Notices. Pursuant to these agreements and consistent with custom and practice in the industry, the cure or repurchase remedy was meant to be a fast commercial mechanism for correcting infrequent, inadvertent deviations from the representations and warranties. DBSP has forced the Trustee (and investor(s) in the Certificates) to go through a lengthy, expensive, and ultimately litigious process merely in order to obtain the benefit of their original bargain.

88. In summarily failing to cure any of the breaches identified in any of the Breach Notices, or to repurchase any of the 1,033 breaching Mortgage Loans, DBSP has breached the cure or repurchase obligation under the PSA and the MLPA for each of the breaching Mortgage Loans.

89. In addition to its cure, substitution and repurchase obligations, DBSP further agreed to reimburse the Trustee for the expenses of enforcing DBSP's obligations under the MLPA and the PSA. *See, e.g.*, MLPA § 4(d); *see also* PSA § 1.01 (definition of "Purchase Price"). The Trustee has incurred substantial expense, and will incur substantial further expense, in enforcing its rights and remedies for DBSP's breaches, and DBSP is required to reimburse the Trustee for these expenses.

90.     The Trust seeks a declaration that DBSP is required to reimburse the Trustee for all costs and expenses related to this action.

**VI.     Enforceability By The Trustee**

91.     The MLPA and the PSA set forth provisions that are intended to, and do, render the representations, warranties, and covenants made by DBSP therein enforceable by the Trustee on behalf of the Trust.

92.     The MLPA provides, in a "Preliminary Statement," that the Seller, Defendant DBSP, "intends to sell the Mortgage Loans" as well as certain other assets, "to the Purchaser," and that the "Purchaser intends to deposit the Mortgage Loans into a mortgage pool comprising the Trust Fund" (that is, the Trust as defined herein).

93.     The MLPA further provides, in Section 3(c), that "[p]ursuant to the Pooling and Servicing Agreement, the Purchaser will assign all of its right, title and interest in and to the Mortgage Loans . . . together with its rights under this Agreement, to the Trustee for the benefit of the Certificateholders."  The Pooling and Servicing Agreement referred to in this provision (and the one alleged immediately below) is the PSA as alleged and defined herein.

94.     The MLPA further provides, in Section 4(d), that "[t]he Purchaser has the right to assign its interest under this Agreement, in whole or in part, to the Trustee, as may be required to effect the purposes of the Pooling and Servicing Agreement, without the consent of the Seller . . . ."

95.     The MLPA further provides, in Section 7(a), that the representations and warranties made in the MLPA by DBSP as Seller of the Mortgage Loans "shall inure to the benefit of any assignee, transferee or designee of the Purchaser, including the Trustee for the benefit of the Certificateholders."

37

96.     The PSA provides, in Section 2.01, headed "Conveyance of the Mortgage Loans," in pertinent part as follows:

> The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, on behalf of the Trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans . . . , the rights of the Depositor under the Mortgage Loan Purchase Agreement . . . .

97.     The Mortgage Loan Purchase Agreement referred to in the PSA is the MLPA as alleged and herein defined. Thus, the Trustee is contractually entitled to enforce both the MLPA, as to which it is an assignee, and the PSA, as to which it is a signatory, including without limitation, DBSP's contractual cure and repurchase obligations arising from breaches of the representations, warranties, and covenants set forth herein.

98.     The Trustee is also not limited in its enforcement to any one remedy under the MLPA, the PSA, or applicable law.  Section 12 of the MLPA provides that "[a]ll rights and remedies of the Purchaser [and therefore the Trustee as its permitted assignee] under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively."   In addition, DBSP's breaches of the representations and warranties set forth in Section 6 of the MLPA, among others, entitle the Trustee to seek remedies outside of those prescribed by Section 2.03(a) of the PSA and Section 7(a) of the MLPA. Thus, the Trustee may select its remedy from those available pursuant to the parties' agreements or afforded by law or equity.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract/Damages

99.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 98 above as though set forth fully herein.

100.    The MLPA and the PSA are valid and enforceable agreements.  The MLPA and PSA are enforceable by the Trustee.  The Trustee has performed all of its obligations in connection with the matters described herein pursuant to the MLPA and PSA.

101.    The MLPA and PSA set forth representations and warranties concerning the Mortgage Loans, requiring DBSP to cure any noticed breaches of such representations and warranties or, failing such cure, to repurchase breaching Mortgage Loans if the breaches materially and adversely affect the value of the breaching Mortgage Loans or the interests of the Trust or the Certificateholders in the Mortgage Loans.

102.    The MLPA and PSA further require DBSP itself to provide notice of any breaches it discovers, and to cure any such breaches or, failing cure, to substitute non-breaching loans or to repurchase breaching Mortgage Loans if the breaches materially and adversely affect the loans' value or the interests of the Trust or the Certificateholders in the loans.

103.    In breach of its contractual representations and warranties, DBSP conveyed to the Trust at least 1,033 breaching Mortgage Loans that were not originated in accordance with applicable underwriting standards, that involved fraud on the part of person(s) in the origination process, that were in material default or breach under the terms of the mortgage or mortgage note, or that were otherwise not in accordance with DBSP's representations and warranties concerning the loans. With respect to each of these Mortgage Loans, one or more of the breaches

materially and adversely affect the value of the Mortgage Loan or the interests of the Trust or the Certificateholders in the loan.

104. Upon information and belief, DBSP discovered these breaches as part of its due diligence. Having on its own discovered breaches, DBSP was required, before ever receiving breach notices from any other party, to provide notification of these breaches, cure the breaches within the contractually required time periods or, failing such cure, to substitute non-breaching loans or to repurchase the breaching Mortgage Loans. In breach of its contractual obligations, DBSP failed to do any of these things.

105. The Reviews revealed breaches of representations and warranties as to at least 1,033 Mortgage Loans. The Reviews uncovered multiple breaches as to many of the breaching Mortgage Loans. With respect to each noticed Mortgage Loan, one or more of the breaches materially and adversely affect the value of the Mortgage Loan or the interests of the Trust or the Certificateholders in the loan. The Breach Notices provided timely notice of the 1,033 breaching Mortgage Loans to DBSP (which DBSP had, upon information and belief, previously discovered on its own and did not notify any others of such discovery). The contractually-provided cure and repurchase periods pursuant to the Breach Notices have expired as to all of the breaching Mortgage Loans identified in the Breach Notices (the cure, substitution, and repurchase periods initiated by DBSP's discovery of these same breaches expired much earlier). DBSP was again in breach of its obligations when it received notices of the breaches from the Trustee, as alleged herein, and failed to cure such breaches or to repurchase the breaching Mortgage Loans.

106. DBSP has failed and refused to cure or repurchase any breaching Mortgage Loans – whether pursuant to its own discovery of such breaches or the Breach Notices. Moreover, DBSP has failed to honor its previous promise to repurchase 59 breaching Mortgage Loans.

Therefore, DBSP has abandoned and repudiated its repurchase obligations as to all breaching Mortgage Loans that it discovered or of which it received notice and is in breach of its contractual obligations. In fact, DBSP has breached its obligations in at least the following ways (each being a separate breach of the contract): by conveying Mortgage Loans in breach of its representations and warranties to the Trust; by refusing to timely notice, cure, substitute or repurchase breaching Mortgage Loans upon its own discovery of breaching Mortgage Loans in the Trust; and by refusing to timely cure or repurchase breaching Mortgage Loans after receiving the Breach Notices.

107.    Pursuant to the terms of the parties' agreements, the Trustee is not limited to seeking only those remedies prescribed by Section 2.03 of the PSA or Section 7(a) of the MLPA.

108.    The Trustee on behalf of the Trust is entitled to damages, in an amount to be determined at trial, for the losses caused by DBSP's breaches of contract.

## SECOND CAUSE OF ACTION
### Fundamental Breach/Rescissory Damages

109.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 108, as though set forth fully herein.

110.    The MLPA and the PSA are valid and enforceable agreements. The MLPA and PSA are enforceable by the Trustee. The Trustee has performed all of its obligations in connection with the matters described herein pursuant to the MLPA and PSA.

111.    DBSP caused the Trust to be created for the purpose of enabling DBSP to transfer to the Trust Mortgage Loans that DBSP wished to securitize and that would serve as collateral and as the source of payment on the securities that DBSP intended the Trust to issue to investors. Securitization trusts are "pass-through" vehicles in which the principal and interest payments literally get passed through to Certificateholders. The principal safeguards for the Trust to

ensure that it possesses Mortgage Loans that have the risk characteristics to which it is prepared to be exposed are the Sponsor's representations and warranties concerning those Mortgage Loans and the remedies available to the Trust in the case of a breach of the representations and warranties. Those representations and warranties, and the corresponding cure/repurchase remedy, are intended to ensure that the Trust is not exposed to the risk that even a single Mortgage Loan does not possess its represented characteristics and risk profile.

112. It simply is not within the parties' reasonable expectations – it is not their contractual bargain – when creating a securitization trust that the securitization sponsor will transfer to the trust a large number of loans that do not possess their represented characteristics. The parties' agreements do not contemplate the Sponsor transferring at least 1,033 defective Mortgage Loans to the Trust. Instead, the agreements evince an understanding that breaching loans will be few in number – the exception rather than the rule – and provide for how such *individual breaching loans* will be dealt with. Thus, the agreements here provide that *any* breach of a representation or warranty as to *any* Mortgage Loan requires the Sponsor, DBSP, to cure the breach or to repurchase the loan. If the breach is discovered within the first two years of the Trust's existence then (and only then, for that limited period of time) can the Sponsor substitute in a new loan for the defective loan.

113. The PSA and the MLPA further indicate the Trust's expectation that such breaches were expected to be rare, given that such agreements provide that DBSP must itself report a breaching loan, thereby triggering its own cure and repurchase obligations. This obligation, among other things, reflects the fact that DBSP itself caused the Trust to be created so that DBSP could securitize the loans and cause securities to be sold to investors, and that DBSP assumed all of the risk that any of the loans would not possess their represented characteristics.

42

Indeed, it also reflects that the Trust reasonably expected DBSP to stand behind its promises, even when doing so would expose DBSP to liability.

114.    What is clear is that the bargain that the Trust (and therefore investors) thought they were making is not the one with which they ended up.  The situation here is so far afield from the bargain the parties struck as to defeat it entirely.  Here, DBSP conveyed to the Trust at least 1,033 breaching loans.  That represents a massive transfer to the Trust of loans that on day one of the Trust failed to have their promised characteristics and had riskier profiles than represented. DBSP never provided notice that a single one of these loans was in breach and DBSP has never cured or repurchased a single one of these loans.  Instead, DBSP has simply ignored and repudiated its contractual repurchase obligations, and in this and other trusts has asserted, even as to loans it previously stated it would buy back, specious defenses that are wholly at odds with the parties' agreements and with custom and practice in the industry.

115.    The net result is that the bargain that the Trust and investors are left with is unrecognizable from the one they made. DBSP has destroyed, repudiated and defeated that bargain.  The parties intended, and the parties' agreements provide, that DBSP would convey to the Trust approximately 3,386 identified Mortgage Loans that were originated in accordance with sound underwriting practices, that were associated with creditworthy borrowers who had not lied about their circumstances, and that otherwise conformed to the law, among other things. DBSP made no fewer than 67 different representations and warranties to this effect.

116.    Where *any one* of these representations and warranties was breached as to *any one* of these loans, DBSP promised to cure the breach or repurchase the loan. The obvious and reasonable import of those representations and warranties was to throw a blanket over all of the loans – the entire Trust corpus – for the purpose of reassuring all concerned that the loans were

"covered" by DBSP; in other words, that the loans were what DBSP represented them to be, that they possessed the risk characteristics that it represented them to have, that any exceptions would be few and would be dealt with promptly by DBSP, that indeed so few loans would be defective that DBSP itself would bring them to light if it "discovered" them, and that DBSP, not the Trust (and not investors), would bear the risks associated with breaching loans.

117.    Instead of the situation described above, the bargain that DBSP has left the Trust with is the following: DBSP conveyed to the Trust a pool of Mortgage Loans filled with defects. On information and belief, DBSP discovered many if not all of those defects but failed to cure or repurchase even the Mortgage Loans it discovered on day one were in breach. In failing to cure or repurchase any of the breaching Mortgage Loans, DBSP has fundamentally defeated and frustrated the parties' agreements and repudiated its contractual obligations, keeping to itself information it had previously discovered concerning the breaching Mortgage Loans and shifting onto other parties a contractual burden it undertook.

118.    The Reviews initiated by the Certificateholder and performed at its initial expense have revealed that the Trust corpus is replete with breaching loans. One or more breaches with respect to each noticed loan materially and adversely affect the value of the Mortgage Loans or the interests of the Trust or the Certificateholders in the loans. The breaches go to core matters such as how much money borrowers earned, where they were employed, where they intended to live and how much indebtedness they had. The breaches reveal a fundamental breakdown of applicable loan underwriting standards. Provided with notice of these breaches, DBSP has simply acted in bad faith. It has refused to acknowledge the breaches, except as to 59 loans it first said it would repurchase and then simply refused to. It has repudiated its own representations and warranties, and its obligation to cure and repurchase the loans.

119.    The fact that DBSP has responded in this manner to breach notices concerning breaches which, at least with respect to some portion, it had already discovered, further evidences that the parties' agreement has been fundamentally defeated and that DBSP has repudiated its contractual obligations.  Upon information and belief, had DBSP not transferred such a large number of breaching loans to this Trust (and others) in the first place, DBSP would not be stonewalling the Trust's efforts to enforce its remedies on behalf of investors.  But the liability that DBSP created for itself is so large that DBSP is simply sidestepping the parties' bargain, as it has been doing (unbeknownst to the Trustee) from day one.  Thus, instead of being able to deal expeditiously and extra-judicially with a handful of breaching loans pursuant to the notice, cure, and repurchase provisions in the parties' agreements, the parties are embroiled in litigation over a massive number of breaching loans.  This is not what the parties agreed to.  Their agreement has been destroyed and repudiated by DBSP.

120.    DBSP's actions in conveying to the Trust a massive number of Mortgage Loans that do not conform to DBSP's own representations and warranties constitute a fundamental breach that defeats the purpose of the parties' agreements.  DBSP's failure to provide notice of a single breach of its representations and warranties, when upon information and belief, it must have discovered there were hundreds, if not thousands, of such breaches further constitutes a fundamental breach of the agreements.   DBSP's failure to abide by the commercial procedure set forth in the parties' agreements – notice, and cure, substitution, or repurchase – further defeats the purpose of those agreements.

121.    DBSP's breaches of the agreements were willful.  On information and belief, DBSP intentionally or with reckless disregard made a series of representations and warranties

that have been proven to be untrue in approximately 4,548 instances as to at least 1,033 loans. Thereafter, DBSP willfully failed to meet its cure, substitution, or repurchase obligations.

122.    DBSP's breaches are so fundamental that they give rise to a right to rescissory damages.  The Trust is entitled to, and the Trustee seeks an award of, rescissory damages in an amount to be determined at trial.

123.    The rescissory damages sought by the Trust include all damages arising from the breaches of contract alleged herein.

## THIRD CAUSE OF ACTION
### Breach of Contract/Specific Performance

124.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 123, above as though fully set forth herein.

125.    In the alternative to its claims for rescissory or compensatory damages, the Trustee seeks an order of specific performance requiring DBSP to repurchase the breaching Mortgage Loans.

126.    DBSP was on notice of the breaching Mortgage Loans based on its own discovery of the breaches.  DBSP has further been provided timely notice of the breaching Mortgage Loans.  The breaches DBSP discovered and of which DBSP has received notice materially and adversely affect the value of the Mortgage Loans or the interests of the Trust or the Certificateholders in the Mortgage Loans.

127.    The MLPA and PSA expressly provide that, unless DBSP has timely cured the noticed breaches, DBSP is required to satisfy its repurchase obligation.

128.    DBSP has failed to satisfy its cure/repurchase obligation with respect to any of the breaching Mortgage Loans in the contractually prescribed time periods.  In fact, DBSP has indicated, in many cases, that it will not cure or repurchase noticed loans.  The Trustee has

performed all of its obligations in connection with the matters described herein pursuant to the MLPA and PSA, and it is ready, willing, and able to perform any remaining obligations required in order to effect repurchase of the identified Mortgage Loans.

129.    In the alternative to the Trustee's claims that it is entitled to damages for DBSP's breaches, and in the absence of any other remedy at law, the Trustee is entitled to an order of specific performance requiring DBSP to repurchase each and every one of the breaching Mortgage Loans. The Mortgage Loans subject to the Breach Notices are identified on Exhibit 3 hereto.

130.    The repurchase price for such loans will be established at trial.

## FOURTH CAUSE OF ACTION
## Declaratory Judgment for Reimbursement of Expenses

131.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 130, above as though set forth fully herein.

132.    A real and justiciable controversy exists as to the rights and legal relations of the parties under the PSA and the MLPA.

133.    The Trustee provided notices to DBSP to cure or repurchase the breaching Mortgage Loans.

134.    The MLPA and the PSA provide that DBSP must reimburse the Trustee for any expenses reasonably incurred in connection with enforcing the remedies for breaches of DBSP's representations and warranties. DBSP has repudiated all of its contractual obligations, including its obligation to reimburse the Trustee for its costs and expenses in connection with enforcing the repurchase remedy pursuant to the parties' agreements.

135.    The expenses for which DBSP is liable include attorneys' fees, as well as expenses incurred by the holders of the Certificates.

47

136.    The Trust has incurred and will continue to incur expenses in enforcing DBSP's obligations under the MLPA and PSA.

137.    The Trust has been damaged and will continue to be damaged in an amount to be determined at trial.

138.    The Trustee has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the MLPA and the PSA. Because this is a justiciable controversy under Rule 57 of the Federal Rules of Civil Procedure, the Trust is entitled to a declaration that DBSP is required to reimburse it for its expenses in enforcing its remedies, including the costs of this action, attorneys' fees, and other such expenses.

## PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of Plaintiff and against the Defendant as follows:

(a)    On the first cause of action, for an award of compensatory damages against DBSP in an amount to be proven at trial;

(b)    On the second cause of action, for an award of rescissory damages against DBSP in an amount to be proven at trial;

(c)    On the third cause of action, for specific performance of DBSP's repurchase obligations;

(d)    On the fourth cause of action, for a declaration that DBSP must reimburse the Trustee for expenses in enforcing DBSP's obligations under the PSA and the MLPA, including attorneys' fees;

(e)    For prejudgment interest at the maximum legal rate; and

(f)     For any such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

DATED:   New York, New York
         March 20, 2013

Respectfully submitted,


HOLWELL SHUSTER & GOLDBERG LLP


By: _____
Michael S. Shuster
Lani A. Perlman
Delyan Dimitrov

125 Broad Street, 39th Floor
New York, NY 10004
(646) 837-5151

*Attorneys for Plaintiff*

49

## Appendix:   Diagram of the ACE 2007-HE3 Securitization



TRANSACTION STRUCTURE