UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 0 2014

ACE SECURITIES CORP. HOME EQUITY LOAN  :
TRUST, SERIES 2007-HE3, by HSBC BANK USA, :
NATIONAL ASSOCIATION, as Trustee,   :
            :
      Plaintiff,   :
   -v-       :
            :
DB STRUCTURED PRODUCTS, INC.,   :
            :
      Defendant.  :
-------------------------------------------------------------------X

13 Civ. 1869 (AJN)

OPINION & ORDER

ACE SECURITIES CORP. HOME EQUITY LOAN  :
TRUST, SERIES 2007-WM2, by HSBC BANK USA, :
NATIONAL ASSOCIATION, as Trustee,   :
            :
      Plaintiff,   :
   -v-       :
            :
DB STRUCTURED PRODUCTS, INC.,   :
            :
      Defendant.  :
-------------------------------------------------------------------X

13 Civ. 2053 (AJN)

OPINION & ORDER

ACE SECURITIES CORP. HOME EQUITY LOAN  :
TRUST, SERIES 2007-HE4, by HSBC BANK USA, :
NATIONAL ASSOCIATION, as Trustee,   :
            :
      Plaintiff,   :
   -v-       :
            :
DB STRUCTURED PRODUCTS, INC.,   :
            :
      Defendant.  :
-------------------------------------------------------------------X

13 Civ. 2828 (AJN)

OPINION & ORDER

1

```
-------------------------------------------------------------------X
ACE SECURITIES CORP. HOME EQUITY LOAN          :
TRUST, SERIES 2007-HE5, by HSBC BANK USA,      :
NATIONAL ASSOCIATION, as Trustee,              :
                                               :        13 Civ. 3687 (AJN)
                                 Plaintiff,    :
                                               :        OPINION & ORDER
             -v-                               :
                                               :
DB STRUCTURED PRODUCTS, INC.,                  :
                                               :
                                 Defendant.    :
-------------------------------------------------------------------X
```

ALISON J. NATHAN, District Judge:

Before the Court are four motions to dismiss filed by Defendant DB Structured Products, Inc. ("DBSP") in four separate breach-of-contract actions brought by HSBC Bank USA, National Association ("Plaintiff" or the "Trustee") on behalf of four residential mortgage securitization trusts for which Plaintiff serves as trustee (the "Trusts"). In each action, Plaintiff alleges that DBSP repudiated its obligations under the Trusts' governing agreements by failing to repurchase mortgage loans that it sold to the Trusts, even though DBSP knew or was notified that those loans were in breach of certain representations and warranties that it made at closing. For the reasons that follow, DBSP's motions are granted in part and denied in part.

## I.    BACKGROUND

The Court will briefly outline the procedural history of these four actions and DBSP's motions to dismiss before turning to Plaintiff's allegations. These actions are materially similar, in terms of the parties and their claims, to two parallel cases, one before Judge Sweet in this district and one in New York state court. *See Deutsche Alt-A Sec. Mortg. Loan Trust, Series*

2

*2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488 (S.D.N.Y. 2013) (granting in part

and denying in part DSBP's motion to dismiss); *ACE Sec. Corp. v. DB Structured Prods., Inc.*,

965 N.Y.S.2d 844 (N.Y. Sup. Ct.) (denying DBSP's motion to dismiss on statute-of-limitations

grounds), *rev'd*, 977 N.Y.S.2d 229 (1st Dep't 2013).

### A. Procedural History

Between March and May of 2013, Plaintiff filed four complaints against DBSP. They

contained similar allegations, but each one concerned a different residential mortgage-backed

securities ("RMBS") transaction involving DBSP. Specifically, No. 13 Civ. 1869, which was

initially assigned to the undersigned, concerned a securitization trust called ACE Securities Corp.

Home Equity Loan Trust, Series 2007-HE3, or "ACE 2007-HE3" (the "HE3 action"); No. 13

Civ. 2053, originally assigned to Judge Hellerstein, involved ACE 2007-WM2 (the "WM2

action"); No. 13 Civ. 2828, originally assigned to Judge Marrero, involved ACE 2007-HE4 (the

"HE4 action"); and No. 13 Civ. 3687, originally assigned to Judge Kaplan, involved ACE 2007-

HE5 (the "HE5 action"). On August 29, 2013, the undersigned accepted the WM2, HE4, and

HE5 actions as related to the HE3 action.

On May 3, 2013, DBSP filed a motion to dismiss in the HE3 action, which was fully

submitted as of July 12, 2013. Subsequently, on July 26, DBSP filed a similar motion to dismiss

in the WM2 action. But once the three related cases were reassigned, the parties stipulated that

DBSP would withdraw its original motion to dismiss in the WM2 action and re-file it

simultaneously with motions to dismiss in the HE4 and HE5 actions. The Court authorized

consolidated briefing for those three motions. Thus, the three motions to dismiss were filed,

along with a single opening brief from DBSP, on September 27, 2013. Plaintiff filed its

opposition on October 25, and DBSP's reply followed on November 15.

As discussed in greater detail below, Plaintiff's allegations and the arguments advanced in the parties' briefs are, with certain exceptions, materially identical across the four cases. In the remainder of this opinion, the Court will note pertinent differences where necessary, but will generally address the factual and legal issues in a unified fashion.

### B. RMBS Securitizations Generally

An RMBS securitization involves the sale to investors of securities, or RMBS, issued by a trust. (For tax reasons, the trust is typically organized as a Real Estate Mortgage Investment Conduit, or "REMIC." *See* 26 U.S.C. §§ 860A–860G.) The trust's assets consist of numerous residential mortgage loans; the payments made on the loans are "passed through" to the investors holding the RMBS, who receive distributions on their securities to the extent and in the priority provided for by the securitization documents. WM2 Compl. ¶¶ 26–30.

A securitization generally involves a "sponsor," which is an affiliate of a bank, which acquires mortgage loans from their originators. The sponsor then sells the loans to a special-purpose entity known as the "depositor," which is typically affiliated with the sponsor, and which immediately transfers (or "deposits") the mortgage loans into the trust. The trust then issues securities to the depositor, which sells them to investors through an underwriter. In this way, the proceeds generated by the sale of the securities ultimately finance the purchase of the mortgage loans. A trustee then holds the loans and administers the trust for the benefit of investors. And a "servicer" is engaged to collect payments on the underlying loans in a manner consistent with the securitization documents. WM2 Compl. ¶¶ 26–27.

The sponsor typically conducts "some form of review" of the mortgage loan origination files and therefore is acquainted with the characteristics of the loans that it sells to the trust via the depositor. These files include borrowers' applications and associated documentation.

4

Because they are not available to investors in the RMBS prior to purchase, and because the

loans' characteristics affect the cash flows that those investors will receive and the credit ratings

of the RMBS, the sponsor makes numerous "representations and warranties" as to the

characteristics of the loans.  These representations and warranties are backstopped by specific

remedies provided in the securitization documents, which generally require a sponsor, once it

becomes aware that a representation or warranty is not accurate with respect to a certain loan, to

either "cure" such breach or replace or repurchase the loan from the trust within a specified

period of time.  WM2 Compl. ¶¶ 28–37.

### C. The Parties' Agreements

Plaintiff was the trustee and DBSP was the sponsor for the four securitizations at issue in

these actions.  Each securitization involved two contracts relevant here: a Mortgage Loan

Purchase Agreement ("MLPA") and a Pooling and Servicing Agreement ("PSA") (together, the

"Agreements").  Both Agreements are governed by New York law.  PSA § 12.04; MLPA § 17.[1]

Pursuant to the MLPA, the depositor, ACE Securities Corp. ("ACE"), purchased the

loans from the sponsor, DBSP.  In the MLPA, ACE is named as the "Purchaser," and DBSP is

named as the "Seller."  The MLPA sets forth numerous representations and warranties made by

DBSP with respect to the characteristics of the mortgage loans.  *See* MLPA § 6.  It also specifies

a repurchase protocol:

> Upon discovery by the Seller, the Purchaser or any assignee, transferee or designee of the
> Purchaser of . . . a breach of any of the representations and warranties contained in
> Section 6 that materially and adversely affects the value of any Mortgage Loan or the

---

[1] The Court follows the parties' lead in not distinguishing between the specific Agreements associated with the
various transactions.  *See* Def. Br. at 2 n.6 ("The MLPAs and PSAs executed in connection with each Trust are
substantially similar in all material respects").  Quoted portions are taken from the Agreements associated with the
ACE 2007-WM2 securitization.  *See* Woll Decl. Exs. 1, 2.

interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, the party discovering such breach shall give prompt written notice to the Seller.  Within sixty (60) days of its discovery or its receipt of notice of . . . any such breach of a representation and warranty, the Seller promptly shall . . . cure such . . . breach in all material respects or, in the event the Seller cannot . . . cure such . . . breach, the Seller shall, within ninety (90) days of its discovery or receipt of notice of . . . any such breach of a representation and warranty, either (i) repurchase the affected Mortgage Loan at the Purchase Price (as such term is defined in the [PSA]) or (ii) pursuant to the provisions of the [PSA], cause the removal of such Mortgage Loan from the Trust Fund and substitute one or more Qualified Substitute Mortgage Loans.

*Id.* § 7(a).  The MLPA provides that "the obligations of the Seller . . . to cure or repurchase a defective Mortgage Loan . . . constitute the sole remedies of the Purchaser against the Seller respecting a . . . breach of the representations and warranties."  *Id.* § 7(c).

Pursuant to the PSA, ACE deposited the loans into the Trusts.  The PSA names ACE as the "Depositor," DBSP as the "Sponsor," and Plaintiff as the "Trustee."  The PSA provides that the "Depositor does hereby transfer, assign, set over and otherwise convey to the Trustee . . . , for the benefit of the Certificateholders, . . . the rights of the Depositor under the [MLPA] (including, without limitation the right to enforce the obligations of the other parties thereto thereunder)."  PSA § 2.01.  The PSA also contains a section concerning the repurchase of defective loans, which references the representations and warranties made by DBSP in the MLPA as well as its cure, substitution, or repurchase obligations under that agreement:

Upon discovery or receipt of notice . . . of a breach by the Sponsor of any representation, warranty or covenant under the [MLPA] in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Sponsor and the Servicer of such . . . breach and request that the Sponsor . . . cure such . . . breach within sixty (60) days from the date the Sponsor was notified of such . . . breach, and if the Sponsor does not . . . cure such . . . breach in all material respects during such period, the Trustee shall enforce the obligations of the Sponsor under the [MLPA] to repurchase such Mortgage Loan . . . at the Purchase Price within ninety (90) days after the date on which the Sponsor was notified of such . . . breach, if and to the extent that the Sponsor is obligated to do so

6

under the [MLPA] . . . . In lieu of repurchasing any such Mortgage Loan as provided above, if so provided in the [MLPA], the Sponsor may cause such Mortgage Loan to be removed from [the Trust] . . . and substitute one or more Qualified Substitute Mortgage Loans . . . .

*Id.* § 2.03(a). And like the MLPA, the PSA provides that "the obligation of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan . . . as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such . . . breach available to the Trustee and the Certificateholders." *Id.*

### D. Plaintiff's Allegations

Plaintiff alleges that DBSP's representations and warranties were false when made with respect to numerous loans in the four Trusts, and that DBSP failed to cure those breaches or replace or repurchase the defective loans in violation of its obligations under the Agreements.

Before Plaintiff brought these actions, an unnamed "Certificateholder" hired an independent firm to conduct a "forensic review" of the loan files associated with the mortgage loans held by the Trusts. *E.g.*, WM2 Compl. ¶ 44. In each case, that review revealed widespread breaches of the representations and warranties, affecting mortgage loans numbering in the hundreds or thousands. *See* HE3 Compl. ¶ 48 (alleging that 994 of the 1,375 loans reviewed were in breach of one or more of DBSP's representations and warranties); WM2 Compl. ¶ 48 (1,254 of 2,093 loans reviewed); HE4 Compl. ¶ 50 (1,117 of 1,607 loans reviewed); HE5 Compl. ¶ 50 (368 of 603 loans reviewed). (Each Complaint provides additional details regarding the discovered breaches.) Plaintiff asserts that the "inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident." WM2 Compl. ¶ 50.

7

Plaintiff alleges upon information and belief that, consistent with the practices of other RMBS sponsors in the industry, DBSP conducted due diligence on the mortgage loans when it first acquired them, and during such due diligence "discovered a material number of breaches on Mortgage Loans subsequently identified by the forensic review." *E.g.*, WM2 Compl. ¶ 11. Additionally, in the HE4 and HE5 actions, Plaintiff claims that DBSP discovered the breaches based on its affiliation with the companies that originated many of the loans that DBSP sold to the Trusts. HE4 Compl. ¶ 105; HE5 Compl. ¶ 105. Under section 7(a) of the MLPA, Plaintiff asserts, DBSP's discovery of these breaches at the time of the securitizations triggered its obligation to cure, replace, or repurchase the defective loans. *E.g.*, WM2 Compl. ¶ 12 (stating that DBSP "had an obligation *on day one* to cure the breaches, substitute non-breaching loans for the breaching loans, or repurchase the breaching loans" (emphasis added)).

Plaintiff also argues that DBSP's obligations were triggered independently as a result of Plaintiff's notifying DBSP of the forensic review's results.  (Under section 7(a) of the MLPA and section 2.03(a) of the PSA, Plaintiff was required to notify DBSP of these breaches after it received notice of them.  WM2 Compl. ¶¶ 69–70.)  For each securitization, Plaintiff sent multiple such notices.  *See* HE3 Compl. ¶ 69 (notices sent on November 21, 2011, January 30, 2012, and November 28, 2012); WM2 Compl. ¶ 70 (July 17, 2012, September 5, 2012, and March 12, 2013); HE4 Compl. ¶ 71 (September 19, 2012, November 19, 2012, and March 12, 2013); HE5 Compl. ¶ 71 (September 5, 2012 and March 12, 2013).  Some of these notices provided, for each loan as to which a breach had been identified, the loan number, the specific representations and warranties that had been breached, the specific subsections of the MLPA setting forth those representations and warranties, and a description of the facts establishing the

8

breaches. *E.g.*, WM2 Compl. ¶ 71. Other notices were somewhat less detailed, but still identified each breaching loan by number. *E.g.*, *id.* ¶ 72.

Notwithstanding DBSP's allegedly discovering and receiving notice of the many breaches of its representations and warranties, DBSP has, to date, not repurchased any of the loans identified in Plaintiff's breach notices. HE3 Compl. ¶ 88; WM2 Compl. ¶ 84; HE4 Compl. ¶ 85; HE4 Compl. ¶ 85.

## II.   LEGAL STANDARD

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party. *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Although factual allegations are therefore afforded a presumption of truth, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (internal quotation mark omitted). "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

In addition to the allegations in the complaint itself, a court may consider documents attached as exhibits, incorporated by reference, or relied upon by the plaintiff in bringing suit, as well as any judicially noticeable matters. *See Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011); *In re Harbinger Capital Partners Funds Investor Litig.*, No. 12 Civ. 1244 (AJN), 2013 WL 5441754, at *15 n.6 (S.D.N.Y. Sept. 30, 2013). "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court

9

need not accept the allegations in the complaint as true." *TufAmerica, Inc. v. Diamond*, — F. Supp. 2d — , No. 12 Civ. 3529 (AJN), 2013 WL 4830954, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559 (LTS), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012)) (internal quotation marks omitted).

## III.   DISCUSSION

In the Complaints, Plaintiff brings four causes of action for contract damages, rescissory damages, specific performance, and declaratory judgment. *E.g.*, WM2 Compl. ¶¶ 99–141.

DBSP makes two primary arguments that the Complaints should be dismissed. First, it argues that under the Agreements' "sole remedy" provisions, the only remedy that the Court may award is specific performance of DBSP's repurchase obligation. On the basis of this argument, DBSP contends that Plaintiff's damages claims are improper and that Plaintiff's specific performance claims also fail for not alleging that repurchase is actually possible for all breached loans. Def. Br. at 4, 5–6.[2] Second, DBSP argues that Plaintiff provided inadequate notice of breached loans and therefore is barred under the Agreements from bringing suit to enforce DBSP's obligations. Def. Br. at 4–5. The Court will address these arguments in turn.

### A. The Sole Remedy Provisions Do Not Require Dismissal

DBSP argues that the Agreements bar Plaintiff's claims for money damages. Plaintiff contends that this question is premature at this stage, but in fact it is a central component of DBSP's argument that the Complaints should be dismissed. Specifically, DBSP argues that Plaintiff's remedies are limited to specific performance of the repurchase remedy. For a court to grant specific performance, performance by the defendant must be possible. *See Wells Fargo*

---

[2] Citations to "Def. Br.," "Pl. Opp.," and "Def. Reply" refer to the parties' consolidated memoranda of law submitted in the WM2, HE4, and HE5 actions. The arguments raised in the HE3 action are materially similar.

*Bank, N.A. v. Bank of Am., N.A.*, No. 11 Civ. 4062 (JPO), 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013). In DBSP's view, the repurchase of many breached loans is *not* possible, since under its interpretation of the Agreements, loans that have been foreclosed upon and liquidated cannot be repurchased. Def. Br. at 23–28. If that is true, and if Plaintiff has not alleged that the breached loans can actually be repurchased, then Plaintiff would, in DBSP's view, fail to state a claim for specific performance. Def. Br. at 5–6.

1. <u>Plaintiff Pleads Only Breaches of the Representations and Warranties</u>

Plaintiff initially argues that whether or not the Agreements' sole remedy provisions limit its remedy for breach of warranty claims to specific performance of DBSP's repurchase obligation, that limitation "simply does not apply to a breach of DBSP's obligation *to* cure or repurchase." Pl. Opp. at 9. In other words, Plaintiff contends that DBSP's failure to repurchase loans that it was obligated to repurchase constitutes an independent breach of contract. The Court disagrees.

"New York law . . . does not recognize pre-suit remedial provisions as constituting separate promises which can serve as the basis for independent causes of action." *DBALT 2006-OA1*, 958 F. Supp. 2d at 499. A breach of contract claim accrues when the plaintiff has a legal right to demand payment. *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 770–71 (2012). When a plaintiff alleges that a representation or warranty was false, the relevant breach is the false representation or warranty, and the plaintiff has a legal right to demand payment as of the date it was made. Numerous courts have held that a defendant's failure to repurchase a breached loan does not affect when the plaintiff's claim accrues, and therefore does not constitute a separate breach of contract. *See, e.g.*, *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12 Civ. 7319 (AT), 2014 WL 572722, at *15 (S.D.N.Y. Feb. 14, 2014)

11

(dismissing claims that defendant breached "duty to cure or repurchase"); *Lehman XS Trust, Series 2006-4N ex rel. U.S. Bank, Nat'l Ass'n v. Greenpoint Mortg. Funding, Inc.*, — F. Supp. 2d —, No. 13 Civ. 4707 (SAS), 2014 WL 108523, at *3 (S.D.N.Y. Jan. 10, 2014) (defendant's "alleged failure to comply with its cure or repurchase obligations does not give rise to a separate breach of contract at the time of refusal"); *ACE Sec. Corp.*, 977 N.Y.S.2d at 231 ("the claims accrued on the closing date of the MLPA, . . . when any breach of the representations and warranties contained therein occurred"); *Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 ex rel. HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc.*, 971 N.Y.S.2d 73, 2013 WL 2072817, at *9 (N.Y. Sup. Ct. May 10, 2013) ("The repurchase obligation . . . is merely a remedy.  It is not a duty independent of the Mortgage Representation breach of contract claims."). True, courts have often approached this issue in the context of determining when a statute of limitations began running, but that question is inextricably intertwined with Plaintiff's theory that it may bring separate contract claims based on DBSP's failure to repurchase breached loans. To sanction Plaintiff's theory would effectively allow a plaintiff to extend the statute of limitations for breach of warranty claims.

Accordingly, the Court rejects Plaintiff's argument that the sole remedy provisions are inapplicable simply because it has pleaded "independent" failure-to-repurchase claims.  Because such claims are not independently actionable, the question of whether Plaintiff's damages claims survive depends on whether the Agreements' sole remedy provisions are enforceable and, if they are, whether they bar damages for Plaintiff's repurchase claims.

Plaintiff cites two cases holding that a defendant's failure to repurchase constitutes an independent breach, but they do not affect the Court's conclusion. One of them, the New York Supreme Court's decision in *ACE Securities Corp.*, 965 N.Y.S.2d 844, was recently reversed by

New York's Appellate Division. *See ACE Sec. Corp.*, 977 N.Y.S.2d 229.   The other, *LaSalle*

*Bank National Association v. Lehman Brothers Holdings, Inc.*, 237 F. Supp. 2d 618 (D. Md.

2002), relied on a First Circuit case for the proposition that "a loan seller's failure to repurchase

non-conforming loans upon demand as required by a contract is an independent breach of the

contract entitling the plaintiff to pursue general contract remedies." *Id.* at 638 (citing *Resolution*

*Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12 (1st Cir. 2002) (applying New York law)).

However, the *LaSalle* court misread that case: although the First Circuit affirmed a district court

opinion relying on an independent breach theory, it pointedly declined to decide whether the

district court's view of the law was correct because that question was not dispositive.   *Resolution*

*Trust Corp.*, 280 F.3d at 18 & n.16.

In this case too, the question of whether DBSP's failure to repurchase breached loans

constitutes a separate breach of contract is of limited relevance.   Indeed, even the court in

*LaSalle*, like the First Circuit in *Resolution Trust Corp.*, clarified that the "general contract

damages" it was authorizing were limited to the amount that the defendant would have paid if it

had repurchased the loans when its obligation to do so arose. *LaSalle*, 237 F. Supp. 2d at 638;

*Resolution Trust Corp.*, 280 F.2d at 18–19 & n.15; *see also Bank of N.Y. Mellon v. WMC Mortg.,*

*LLC*, 41 Misc.3d 1230(A), 2013 WL 6153207, at *1 (N.Y. Sup. Ct. Nov. 21, 2013) (noting that

"virtually all of the federal and state courts in New York that have recently considered this issue

have held that a Trust's ability to recoup its RMBS losses is limited to the defined repurchase

price for non-conforming loans," regardless of how the breach is characterized) (footnotes

omitted).   As explained below, although Plaintiff's independent breach theory is erroneous, the

sole remedy provisions do not bar a similar measure of money damages.

13

2.  Plaintiff's Remedies May Include Money Damages

Contracting parties are generally free to limit their remedies, and courts applying New

York law routinely enforce such limitations according to their terms.  *See Baidu, Inc. v.*

*Register.com, Inc.*, 760 F. Supp. 2d 312, 317–18 (S.D.N.Y. 2010) (Chin, J).  This reflects the fact

that "[a] limitation on liability provision . . . represents the parties' Agreement on the allocation

of the risk of economic loss in the event that the contemplated transaction is not fully executed,

which the courts should honor."  *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d

430, 436 (1994).

The Agreements state that "the obligation of [DBSP] to cure or to repurchase" breached

loans "shall constitute the sole remedy respecting such . . . breach" available to the Trusts, the

Trustee, and the certificateholders.  PSA § 2.03(a); *see also* MLPA § 7(c) (employing materially

identical language).  Notwithstanding that language, Plaintiff clearly is entitled to sue DBSP for

failing to comply with its obligations, and DBSP does not argue otherwise.  *See* PSA § 2.03(a)

(contemplating the Trustee's ability to "enforce" DBSP's repurchase obligation); *cf. Assured*

*Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 Civ. 2375 (JSR), 2011 WL 5335566, at *4–5

(S.D.N.Y. Oct. 31, 2011) ("the 'sole remedy' provisions of the Transaction Documents do not

preclude AGM from bringing suit against Flagstar in the event that . . . Flagstar refuses to

comply with its repurchase obligations").  Nonetheless, as other courts have held, the clear

contractual limitations on Plaintiff's remedies do not dissolve simply because it must bring suit

to enforce those remedies; in other words, the only remedy available to Plaintiff remains the cure

or repurchase of defective loans.  *See MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS*

*Real Estate Sec., Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, at *4 (S.D.N.Y. Aug. 15,

2013); *DBALT 2006-OA1*, 958 F. Supp. 2d at 497–500; *Flagstar*, 2011 WL 5335566, at *5.

14

Thus, by their terms, the Agreements limit Plaintiff to seeking an order of specific performance compelling DBSP to repurchase loans at the Purchase Price.

However, specific performance is an equitable remedy, and "where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy." *Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 443 (1956). In DBSP's view, the repurchase of many breached loans is impossible, since under its interpretation of the Agreements, loans that have been foreclosed upon and liquidated cannot be repurchased. Def. Br. at 23–28. With respect to such loans, DBSP would have the Court award Plaintiff no remedy at all. But even assuming that DBSP's interpretation of the Agreements is correct, and that some loans can no longer be repurchased, a number of courts have been willing—in the face of sole remedy provisions like the ones in the Agreements—to award money damages equivalent to what the defendant would pay were performance possible.[3] *See Resolution Trust Corp.*, 280 F.3d at 18; *MASTR 2006-OA2*, 2013 WL 4399210, at *3–4; *DBALT 2006-OA1*, 958 F. Supp. 2d at 500–01; *Flagstar*, 2011 WL 5335566, at *5–6. DBSP cites only one case that actually holds

---

[3] DBSP suggests that allowing Plaintiff to recover damages where specific performance is impossible is equivalent to adopting the "failure of essential purpose" doctrine, which DBSP argues is confined to UCC cases. Def. Reply at 10; *see, e.g., Cayuga Harvester v. Allis-Chalmers Corp.*, 95 A.D.2d 5, 6–7 (4th Dep't 1983) (under the UCC, when "a limited remedy . . . fails of its essential purpose, the buyer is relieved of its restrictions and may resort to other remedies"). No matter how they are characterized, however, the cases cited in the text hold that where specific performance is no longer possible as a result of a defendant's failure to comply with its repurchase obligations, courts may award damages to make the plaintiff whole. *See S. Fin. Grp., LLC v. McFarland State Bank*, No. 12 Civ. 848, 2013 WL 5447994, at *8 (E.D. Wis. Sept. 30, 2013) (discussing this issue). Which is simply to say that the UCC's "failure of essential purpose" doctrine appears to be consistent with broader principles of equity. *See Orix Real Estate Capital Mkts., LLC v. Superior Bank, FSB*, 127 F. Supp. 2d 981, 983 (N.D. Ill. 2000) ("[T]he leading English case on failure of essential purpose, *Krell v. Henry*, 2 K.B. 740 (1903), concerns a short term apartment lease, the purpose of which was to witness Edward VII's coronation, a ceremony that was later cancelled due to Edward's illness; this would not have been a UCC contract.").

to the contrary,[4] *MASTR Asset Backed Sec. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012), and the Court will decline to follow it in light of persuasive in-Circuit precedent permitting money damages where repurchase is or may be impossible.  DBSP suggests that damages will amount to a windfall for Plaintiff because the Agreements specifically contemplate its being unable to recover for liquidated loans, Def. Reply at 10, but that argument is doubly circular: it assumes both DBSP's position that liquidated loans cannot be repurchased and that the parties expected courts not to grant damages in lieu of specific performance with respect to liquidated loans.

DBSP does cite some New York cases holding that sole remedy provisions like the ones at issue here render *consequential* damages unavailable, but those cases are fully consistent with the Court's conclusion.  *See Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 964 N.Y.S.2d 57, 2012 WL 5192752, at *8 (N.Y. Sup. Ct. Oct. 11, 2012), *rev'd in part on other grounds*, — N.Y.S.2d — , 2014 WL 750485 (1st Dep't Feb. 27, 2014); *Home Equity Mortg. Trust Series 2006-5 v. DLJ Mortg. Capital, Inc.*, No. 653787/2012, slip op. at 12–13 (N.Y. Sup. Ct. Sept. 18, 2013), Woll Decl. Ex. 28.  The fact that money damages are available under certain circumstances as an alternative means of enforcing DBSP's repurchase obligation does not affect whether Plaintiff's remedies are, in fact, limited to enforcement of that obligation.  That is, to the extent that the Agreements' sole remedy clauses are valid and enforceable, they preclude Plaintiff from recovering types of damages—such as consequential damages—beyond what

---

[4] In two other cases cited by DBSP, the court dismissed damages claims because the plaintiff entirely failed to allege that it was entitled to specific performance. *See First Bank Richmond, N.A. v. Credit Suisse First Boston Corp.*, No. 07 Civ. 1272, 2008 WL 4410367, at *12 (S.D. Ind. Sept. 24, 2008); *Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, No. 07 Civ. 690, 2008 WL 1817294, at *8 (M.D. Fla. Apr. 22, 2008).  These cases are inapposite because Plaintiff has pled its entitlement to specific performance; the question is whether money damages may be awarded where that equitable remedy is unavailable. *E.g.*, WM2 Compl. ¶¶ 126–133.

16

would be "commensurate with the sole remedy clause." *MASTR 2006-OA2*, 2013 WL 4399210, at *4. The Court's role is limited to ensuring that the parties receive the benefit of their bargain, and does not extend to granting relief that the Agreements explicitly do not contemplate. *See Soggs v. Crocco*, 247 A.D.2d 887, 888–89 (4th Dep't 1998).

With that said, Plaintiff argues that the sole remedy provisions are not, in fact, enforceable in light of DBSP's alleged gross negligence and willful misconduct. Pl. Opp. at 12–14. As noted above, courts applying New York law will ordinarily enforce sole remedy provisions according to their terms. However, that principle sometimes yields to public policy considerations that prevent contracting parties from insulating themselves from the consequences of their own egregious misconduct. *See Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992) ("a party may not insulate itself from damages caused by grossly negligent conduct"); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85 (1983) ("an exculpatory agreement, no matter how flat and unqualified its terms, . . . will not apply to exemption of willful or grossly negligent acts"). On the other hand, while the New York Court of Appeals has applied this rule "equally to contract clauses purporting to exonerate a party from liability and clauses limiting damages to a nominal sum," *Sommer*, 79 N.Y.2d at 554; *see also Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 682–83 (2012), the sole remedy provisions in this case do neither of those things.

Nonetheless, numerous courts have held or assumed that less dramatic limitations on remedies, such as caps on damages or restrictions on the types of damages available, can also be void where gross negligence or willful misconduct is shown. *See, e.g., Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 544–45 (S.D.N.Y. 2013) (Carter, J.) (assuming that provision barring "consequential, incidental, punitive or special damages" might

17

be void but finding that showing of willful misconduct was insufficient); *Tradex Europe SPRL v. Conair Corp.*, No. 06 Civ. 1760 (KMW) (FM), 2008 WL 1990464, at *1, *3–5 (S.D.N.Y. May 7, 2008) (similar); *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 449–56 (S.D.N.Y. 2003) (Marrero, J.) (similar); *Deutsche Lufthansa AG v. Boeing Co.*, No. 06 Civ. 7667 (LBS), 2007 WL 403301, at *1, *3–4 (S.D.N.Y. Feb. 2, 2007) (same for indemnity provision limiting liability to $1 million in the aggregate); *Soroof Trading Dev. Co. v. GE Microgen Inc.*, No. 10 Civ. 1391 (LGS), 2013 WL 5827698, at *11–12 (S.D.N.Y. Oct. 30, 2013) (denying summary judgment on enforceability of provision limiting liability to $1 million in light of fact questions as to willfulness and gross negligence). And in *DBALT 2006-OA1*, a case very similar to this one, Judge Sweet cited allegations of gross negligence and willful misconduct as one ground for holding that Plaintiff's damages claims against DBSP could survive. *See* 958 F. Supp. 2d at 500–01.

Granted, the above-cited cases extend the Court of Appeals's holdings well beyond "clauses purporting to exonerate a party from liability and clauses limiting damages to a nominal sum." As a result, it is unclear whether the Agreements' sole remedy clauses are subject to attack in the first place. *But cf. Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (rejecting argument that public policy exception "applies only to clauses that completely exempt a party from liability, not to those that limit liability"). Moreover, even assuming that they are, it is doubtful whether the Complaints allege the kind of "reckless indifference to the rights of others" that is required for a limitation on liability to be void. *Abacus*, 18 N.Y.3d at 683. Contractual nonperformance that is merely in a defendant's economic self-interest does not suffice, even if it is intentional. *See Five Star Dev. Resort Cmtys. v. iStar RC Paradise Valley, LLC*, No. 09 Civ. 2085 (LTS), 2012 WL 4119561, at *4–5 (S.D.N.Y. Sept. 18, 2012); *Metro. Life Ins. Co.*, 84

18

N.Y.2d at 438–39. Repeated incantations of the word "willful" do not magically transform an economically motivated breach into the egregious conduct required to negate an unambiguous contract term negotiated by sophisticated parties. *See DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 317–18 (S.D.N.Y. 2002) (Hellerstein, J.); *see also Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) (Castel, J.) ("in a contract between sophisticated parties, . . . New York applies a more exacting standard of gross negligence than it would in other contexts").

At this stage, however, these questions do not require definitive resolution. The fact that the sole remedy provisions do not bar Plaintiff from seeking damages where repurchase is impossible dispenses with DBSP's theory that specific performance is the only remedy available in these actions. As a result, even if the sole remedy provisions are enforceable, Plaintiff's failure to allege which loans are actually subject to repurchase is not fatal to its claims. The Court therefore need not decide whether the sole remedy provisions are enforceable. Nor must the Court address the parties' arguments regarding whether liquidated loans are, in fact, subject to repurchase.[5]

### 3. Plaintiff's Rescissory Damages Claims Survive

The Court also denies DBSP's motion to dismiss Plaintiff's rescissory damages claims. DBSP initially argues that Plaintiff waived its right to seek this "very rarely used equitable tool," *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 413 (1st Dep't 2013), by

---

[5] In the alternative, even assuming both that the sole remedy provisions are enforceable and that—contrary to the Court's earlier conclusion—Plaintiff is limited to specific performance without resort to money damages, Plaintiff's failure to plead which loans are subject to repurchase still would not be fatal to its claims because loan-by-loan allegations are not required at this stage. *See DBALT 2006-OA1*, 958 F. Supp. 2d at 504 n.12 ("DBSP does not allege . . . that *all* the loans at issue were liquidated or paid off, or even specific loans it believes 'no longer exist.' It is therefore premature to dismiss Plaintiff's specific performance claims merely because certain of the loans may or may not have been liquidated or foreclosed upon." (citation omitted)).

agreeing that its "sole remedy" for breaches of the representations and warranties would be specific performance of DBSP's repurchase obligation. Def. Br. at 14–16. DBSP is correct that "explicit language" specifying a "sole remedy" is ordinarily a "complete bar to equitable relief." *Rubinstein v. Rubinstein*, 23 N.Y.2d 293, 298 (1968). But as noted above, contractual limitations on liability can be void under certain circumstances, and the public policy exceptions to the enforceability of liability waivers affect Plaintiff's right to rescissory damages no less than its right to consequential damages or other legal remedies not contemplated by the Agreements. *Cf. Abele Tractor & Equip. Co. v. Varity Corp.*, 977 F. Supp. 1252, 1254 (N.D.N.Y. 1997) (rescission waivers are enforceable "[a]bsent fraud"); *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006) (noting the "strong tradition in American law that holds that contracts may not insulate a party from damages *or rescission* resulting from the party's fraudulent conduct" (emphasis added)).[6] The Court has already determined that the enforceability of the sole remedy clauses need not be addressed at this stage, and given that courts are generally hesitant in any event to strike remedies before the parties have presented any facts bearing on the suitability of equitable relief, *see Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894–98 (2d Cir. 1976); *DBALT 2006-OA1*, 958 F. Supp. 2d at 506; *Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12 Civ. 1579 (HB), 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012), the Court also declines to decide whether the sole remedy clauses bar Plaintiff's rescissory damages claims.[7]

---

[6] Although the cases cited in the text concern fraud, and not the gross negligence and willful misconduct alleged by Plaintiff, they illustrate that public policy exceptions to freedom of contract apply equally to rescission and damages claims. As noted earlier, the public policy of New York bars enforcement not only of fraud waivers but also of clauses insulating parties from their gross negligence and willful misconduct.

[7] Several cases that DBSP cites as barring rescission because of sole remedy clauses were decided on summary judgment, *see DBALT 2006-OA1*, 958 F. Supp. 2d at 506 n.16 (making this distinction), and none appears to have

The Court's conclusion that dismissal is premature is actually reinforced by DBSP's second argument—that rescissory relief is available only when a plaintiff has no "complete and adequate remedy at law." *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972). DBSP simply asserts that repurchase is an adequate remedy without explaining why, or how the Court ought to determine a remedy's adequacy at this stage. As Judge Sweet noted in *DBALT 2006-OA1*, Plaintiff's rescissory damages claims are pled in the alternative to its claims for repurchase, belying any suggestion that Plaintiff itself believes that repurchase will necessarily be adequate. 958 F. Supp. 2d at 506; *see also* Fed. R. Civ. P. 8(d)(2) (allowing for alternative statements of a claim in either the same count or separate ones); *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F. Supp. 713, 718 (S.D. Ind. 1991) ("The axiomatic rule that equitable relief may not be granted when adequate legal relief exists does not affect the viability of either type of claim at the pleading stage."), *modified on other grounds on reconsideration*, 796 F. Supp. 1164 (S.D. Ind. 1992); 13-67 *Corbin on Contracts* § 67.8[8]. Additionally, the principle that a contracting party cannot insulate itself from the consequences of its gross negligence or willful misconduct suggests that an "adequate" remedy is one that places the full measure of those consequences on that party. *Cf. Turkish*, 27 F.3d at 28. Because it is conceivable that the legal remedies available to Plaintiff would fall short in this regard, it would be premature for the Court to strike an equitable remedy at this stage without a decisive reason for doing so.

In a footnote, DBSP also obliquely suggests that because Plaintiff did not actually seek rescission, rescissory damages—which are designed to act as "the economic equivalent of

---

involved allegations of gross negligence or willful misconduct. *See MBIA Ins. Corp.*, 105 A.D.3d at 413; *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 39 Misc.3d 1220(A), 2013 WL 1845588, at *10 (N.Y. Sup. Ct. Apr. 29, 2013); *Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 652763/2912, slip op. at 16–17 (Sup. Ct. N.Y. Aug. 16, 2013); *Home Equity Mortg. Trust Series 2006-5 v. DLJ Mortg. Capital, Inc.*, No. 653787/2012, slip op. at 12–13 (Sup. Ct. N.Y. Sept. 18, 2013).

rescission in a circumstance in which rescission is warranted, but not practicable," *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 855 A.2d 1059, 1072 (Del. Ch. 2003)—should not be available. Def. Br. at 14 n.18. This argument finds some support in New York case law. *See MBIA Ins. Corp.*, 105 A.D.3d at 413; *Home Equity Mortg. Trust Series 2006-5 v. DLJ Mortg. Capital, Inc.*, No. 653787/2012, slip op. at 13 & n.3 (Sup. Ct. N.Y. Sept. 18, 2013). But the Court need not address this argument, which—likely because it is raised only in a footnote—has not been presented squarely or briefed in any detail. *See In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 351 n.13 (S.D.N.Y. 2006) (Lynch, J.) (declining to address argument raised in footnote "though it might have merit"). Without adequate briefing, the Court cannot conclude that Plaintiff's choice not to seek rescission was not simply a pragmatic decision driven by the obvious difficulty of unwinding the Agreements. For all of these reasons, the Court declines to dismiss Plaintiff's rescissory damages claims.

### B. Plaintiff States a Claim Based on DBSP's Discovery of Breaches

As noted above, the Agreements' sole remedy provisions do not preclude Plaintiff from bringing suit to enforce DBSP's repurchase obligations when DBSP fails to comply with those obligations. Plaintiff points to two ways in which DBSP failed to comply with its obligations. First, it alleges that DBSP discovered numerous breaches of representations and warranties in the loan pools at the time of securitization but failed to either cure those breaches within 60 days or repurchase or substitute for the defective loans within 90 days, as required by the MLPA. *E.g.*, WM2 Compl. ¶ 3. Second, Plaintiff alleges that it provided notice of thousands of specific breaches to DBSP, independently triggering DBSP's cure-or-repurchase obligation. *E.g.*, *id.* ¶¶ 4, 13. For the following reasons, Plaintiff's claims survive based on the former theory, meaning that Plaintiff is entitled to discovery to determine the extent to which DBSP became

22

aware of breaches in the Trusts.  In light of that conclusion, the Court need not address Plaintiff's alternative "notice" theory.

### 1.  The Complaints Adequately Plead Discovery

DBSP agrees with Plaintiff that under section 7(a) of the MLPA, its cure or repurchase obligation arises "upon either notice or its own discovery."  Def. Br. at 18.  However, it argues that Plaintiff's allegations that DBSP discovered breaches are inadequate to survive a motion to dismiss.  The Court disagrees.

The Complaints allege that DBSP was familiar with the characteristics of the loans that it sold to the Trusts as a result of its dealings with the loans' originators and the due diligence that it performed on the loans before selecting them for inclusion in the Trusts.  *E.g.*, WM2 Compl. ¶¶ 3, 8–9, 11–12, 31, 41.  The Complaints also allege that Plaintiff's subsequent forensic review of the loans revealed breaches that would have been apparent to DBSP based on its familiarity with the loans.  Many of the forensic review's findings concerned the loans' characteristics when they were initially sold to the Trusts, for instance, whether the borrowers were current on their payment obligations at that time.  *E.g.*, WM2 Compl. ¶ 49.  By alleging that DBSP conducted due diligence on loan pools that suffered from obvious and widespread breaches, Plaintiff has adequately alleged that DBSP discovered those breaches, and therefore that its cure-or-repurchase obligations were triggered independent of any notices.  *Accord DBALT 2006-OA1*, 958 F. Supp. 2d at 494 (holding that Plaintiff's claims were not restricted to loans for which it provided notice of alleged breaches because "Plaintiff contends that 'it is not commercially plausible' to infer that DBSP, during even a passing due diligence review, would not uncover . . . obvious and severe breaches" throughout the loan pools).

DBSP makes two arguments to the contrary, neither of which is persuasive.  First, it argues that in alleging widespread breaches among the mortgage loans underlying the Trusts, Plaintiff advances mere legal conclusions, which are not entitled to a presumption of truth.  Def. Br. at 19; *see Iqbal*, 556 U.S. at 678 (a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)).  However, the Complaints do not simply assert, without more, that a certain number of loans were in breach of the representations and warranties.  Instead, they say which representations and warranties were breached, and how.  For example, in the WM2 action, the Complaint alleges that "208 Mortgage loans were past due . . . on the Closing Date."  WM2 Compl. ¶ 59.  It also alleges that in the MLPA, DBSP represented that no loans were in breach of their payment obligations as of the closing date.  *Id.* ¶ 53; *see* MLPA § 6(xiv).  These are factual allegations, not legal conclusions.

Second, DBSP argues that Plaintiff's allegations that DBSP discovered breaches "simply because it performed the routine diligence typical of RMBS sponsors in the industry" are overly speculative.  Def. Br. at 18.  Yet the "plausibility" standard articulated in the Supreme Court's *Twombly* and *Iqbal* decisions does not require a plaintiff to demonstrate that its allegations are true before a presumption of truth attaches to those allegations; that would put the cart before the horse.  Instead, a court must ask whether the plaintiff's factual allegations, *taken* as true, make the *claim* of wrongdoing by the defendant "plausible."  *See Twombly*, 550 U.S. at 556; *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (noting that the plausibility standard "does not prevent" a plaintiff from pleading facts upon information and belief "where the facts are peculiarly within the possession and control of the defendant").  Taken as true, Plaintiff's allegations that DBSP performed due diligence on loan pools rife with defects makes

its claims that DBSP discovered breaches of the representations and warranties more than plausible.[8]

It is true that, unlike Plaintiff's theory that DBSP's repurchase obligation was triggered upon notice, its "discovery" theory does not furnish a basis for determining which specific breaches DBSP actually discovered, and therefore which loans it was obligated to repurchase. *See* Def. Br. at 19 (noting that Plaintiff's theory does not raise "more than a sheer possibility" that "discovery actually occurred with respect to any loan"). However, as DBSP concedes, several courts "have found that, as a matter of pleading sufficiency, a complaint for repurchase need not contain specific allegations regarding each loan at issue." Def. Reply at 12; *see, e.g.*, *MASTR 2006-OA2*, 2013 WL 4399210, at *5; *DBALT 2006-OA1*, 958 F. Supp. 2d at 497 & n.4; *First Bank Richmond, N.A. v. Credit Suisse First Boston Corp.*, No. 07 Civ. 1262, 2008 WL 4410367, at *12 (S.D. Ind. Sept. 24, 2008); *ACE 2006-SL2*, 965 N.Y.S.2d at 849. Those cases lend support to the Court's conclusion, which notably does not relieve Plaintiff of its burden of proving loan-by-loan breaches at later stages of litigation.[9]

DBSP cites only one RMBS case to the contrary, *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings*, No. 5140-CS, 2012 WL 3201139 (Del. Ch. June 22, 2012), but its reliance on that case is misplaced. Although *Central Mortgage Co.* primarily involved the "relation back" doctrine with respect to a statute of limitations, it does contain language stating

---

[8] In the HE4 and HE5 actions, Plaintiff alleges another basis for its discovery allegations: DBSP's affiliation with two entities that originated loans underlying the Trusts. HE4 Compl. ¶¶ 52, 59, 62; HE5 Compl. ¶¶ 52, 59, 62. DBSP argues that this affiliation does not lend support to Plaintiff's discovery allegations. Def. Br. at 19. Because the Court concludes that those allegations are sufficient without considering DBSP's affiliates, it need not address the parties' arguments concerning this issue.

[9] As Plaintiff notes, many courts have accepted statistical "sampling" as a means of demonstrating liability in RMBS cases. Pl. Opp. at 18–19. The Court need not decide now whether that method of proof is appropriate in this case.

that loan-by-loan breach allegations are required at the motion-to-dismiss stage. *See id.* at *18–19. However, the court also made clear that it was applying a Delaware pleading standard that requires "specific facts that make out a cause of action." *Id.* at *13. That standard is higher than the one applied in federal court. *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (stating that under Rule 8(a)(2), "[s]pecific facts are not necessary," and that a complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted)). Accordingly, *Central Mortgage Co.* does not provide a persuasive basis for DBSP's argument that Plaintiff's allegations do not meet federal pleading standards.

### 2. Adequacy of Notice Is Irrelevant at this Stage

DBSP argues that Plaintiff's claims should be dismissed because providing adequate notice of breaches is a prerequisite to bringing suit, and the notices that Plaintiff provided to DBSP were inadequate. However, the Court need not resolve these issues because at this stage, based on Plaintiff's discovery allegations, the adequacy of its breach notices is moot.

As an initial matter, the formal legal significance of Plaintiff's notice obligation is unclear from the parties' briefing. A plaintiff's entitlement to sue for breach of contract depends on whether it has performed its own obligations, *see Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1999), and a plaintiff also must have "substantially performed" its own contractual duties in order for a court to grant specific performance, *Wells Fargo*, 2013 WL 372149, at *8. Consistent with these principles, DBSP appears to be attacking the adequacy of Plaintiff's performance. *See* Def. Br. at 4 ("Plaintiff's own failure to abide by the terms of the Agreements bars its specific performance claims."); *cf. MASTR 2006-OA2*, 2013 WL 4399210, at *5 ("UBS argues that 'adequate performance by the plaintiff' has not been alleged because the Complaint does not

26

allege that there was prompt notice or notice by the Trustee . . . ."). However, several courts considering contractual notice provisions in similar contexts have asked whether providing adequate notice is an express condition on a defendant's obligation to repurchase defective loans. *See Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *7 (S.D.N.Y. Oct. 11, 2005); *LaSalle Bank Nat'l Ass'n v. Citicorp. Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003); *Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ. 8613 (SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002).[10] Although not addressed by the parties, this distinction is important because an express condition must be literally performed in order for the relevant obligation to arise, while a plaintiff's performance of other contractual promises must be merely "substantial" before it can recover for a defendant's breach. *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995) ("constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient"). DBSP's insistence that a lack of adequate notice represents a per se bar to Plaintiff's claims implies the belief that Plaintiff's notice obligation must be literally performed.

To resolve these issues, the Court must examine the terms of the parties' contracts. DBSP's representations and warranties are contained in the MLPA, not the PSA, and its repurchase obligations are governed by the MLPA, not the PSA. The PSA speaks of representations and warranties made by DBSP "under the [MLPA]," makes clear that DBSP's

---

[10] Other courts have characterized inadequate notice arguments as going to a claim's ripeness, *see Flagstar*, 2011 WL at *7; *MASTR 2006-HE3*, 843 F. Supp. 2d at 1000, but to say that a contract claim is ripe for adjudication is basically equivalent to saying that all conditions precedent have occurred, *see, e.g., Sirob Imps., Inc. v. Peerless Ins. Co.*, 958 F. Supp. 384, 388–90 (E.D.N.Y. 2013).

repurchase obligations arise "under the [MLPA]," and requires the Trustee to enforce DBSP's duty to repurchase a defective loan only "if and to the extent that [DBSP] is obligated to do so under the [MLPA]." PSA § 2.03(a); *see also, e.g.,* WM2 Compl. ¶ 10 n.4, ¶ 41. As DBSP concedes, the MLPA clearly states that DBSP's repurchase obligation arises upon discovery, and it does not provide that the Purchaser must notify DBSP of breached loans before enforcing DBSP's duty to repurchase those loans.[11] *See* MLPA § 7(a).

Plaintiff also has the right to enforce the obligations that the MLPA imposes on DBSP. The MLPA states that upon the closing of the Trusts, ACE "will assign . . . its rights under this Agreement, to the Trustee for the benefit of the Certificateholders." MLPA § 3(c). In turn, the PSA states that ACE "does hereby transfer, assign, set over and otherwise convey to the Trustee . . . , for the benefit of the Certificateholders, . . . the rights of the Depositor under the [MLPA] (including, without limitation the right to enforce the obligations of the other parties thereto thereunder)." PSA § 2.01.

DBSP's argument that pre-suit notice is required centers on section 2.03(a) of the PSA. That section provides that if the Trustee discovers or receives notice of a breach, it must promptly notify DBSP and ask it to cure the breach or repurchase the loan within 60 days.[12] If DBSP does not do so, the Trustee must "enforce" DBSP's obligation within 90 days of providing notice. PSA § 2.03. To DBSP, this provision suggests that Plaintiff may not enforce DBSP's repurchase obligation *unless* it first provides notice and waits the required amount of time.

---

[11] DBSP implies that the PSA's failure to also provide that DBSP's repurchase obligation arises upon discovery is somehow relevant, Def. Br. at 18, but that is hardly surprising: the PSA does not impose *any* repurchase obligation on DBSP because that obligation arises under the MLPA.

[12] Plaintiff also has an obligation to notify DBSP upon discovering a breach under section 7(a) of the MLPA, as an assignee of ACE's rights under that Agreement. Unlike the PSA, the MLPA does not require Plaintiff to ask DBSP to take any action upon receiving such notice. *Compare* PSA § 2.03(a), *with* MLPA § 7(a).

Indeed, suing to make DBSP repurchase breached loans—even those that DBSP itself has discovered and is therefore already obligated to repurchase under MLPA section 7(a)— necessarily requires first becoming aware of the alleged breaches. Under a literal reading of PSA section 2.03(a), that awareness triggers a duty to notify DBSP of the breaches, then wait, and only then "enforce" DBSP's repurchase obligation.

However, under the Agreements' terms, notice does not operate as an express condition precedent. Under New York law, "[i]n determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Love Funding*, 2005 WL 2582177, at *7 (alteration in original) (quoting *Oppenheimer & Co.*, 86 N.Y.2d at 691) (internal quotation marks omitted). Nothing in the Agreements either specifically provides that the Trustee may not sue to enforce DBSP's repurchase obligation unless it has provided notice or expressly conditions DBSP's repurchase obligation on receiving notice from the Trustee. *Cf. Flagstar*, 2011 WL 5335566, at *7 ("notably absent . . . is any indication that the parties intended this 'notice and opportunity to cure' process to be the exclusive means by which AGM may enforce its rights under the Transaction Documents"). Of course, if DBSP had not initially discovered the breaches, its repurchase obligation would not be triggered in the first place without the Trustee's notice. But with respect to breaches that DBSP did discover, in the absence of explicit contractual language to the contrary, the Trustee's duty to provide notice of breaches is simply a promise, not an express condition that must be literally performed.

Therefore, Plaintiff's nonperformance would have to be "material" to bar its claims. "Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284,

289 (2d Cir. 1997) (quoting *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).  One factor in determining materiality is "the extent to which the injured party will be deprived of the benefit which he reasonably expected."  Restatement (Second) of Contracts § 241(a); *see Encompass Ins. Co. of Am. v. English*, No. 11 Civ. 2606 (KMW), 2013 WL 796309, at *5 (S.D.N.Y. Mar. 5, 2013); *Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005).  DBSP's argument amounts to the claim that the notice obligation imposed by section 2.03(a) of the PSA is an integral part of the repurchase protocol, which DBSP bargained for and is entitled to rely upon.

However, the Trustee's obligation to notify DBSP of breaches might also be understood as a kind of promise to take specific action for the benefit of certificateholders.  Without such language, the Trustee, whose compensation is not conditioned on the performance of the trust assets, *see* PSA § 9.05 ("The fees of the Trustee . . . shall be paid in accordance with a side letter agreement with the Master Servicer and at the sole expense of the Master Servicer."), might have little incentive to enforce DBSP's repurchase obligations.  On this reading, Plaintiff's duty to notify DBSP of any breaches it discovers would not have been part of any "bargain" between the Trustee and DBSP.  Indeed, DBSP is not even a party to the PSA, which it signed only for the purpose of acknowledging and agreeing to section 9.05, which does not involve repurchase.  Woll Decl. Ex. 1 at 127. This further implies that the contours of DBSP's bargain with respect to the repurchase protocol were set entirely by the terms of the MLPA.

Additionally, DBSP's argument amounts to the position that the Trustee can sue to force DBSP to repurchase breached loans only if someone other than DBSP discovers the breaches, since logically the Trustee cannot provide notice—a prerequisite to suit, in DBSP's view— unless it first discovers or is told about a breach.  This would make questionable sense.  DBSP's

reading allows it to sit on its hands after discovering a breach merely because the Trustee has not also discovered and noticed the same breach, effectively nullifying the "discovery" language in section 7(a) of the MLPA. *See Gulf Ins. Co. v. Transtl. Reins. Co.*, 69 A.D.3d 71, 81 (1st Dep't 2009) (contracts should be interpreted so as to harmonize their provisions). It seems particularly unlikely that the parties intended DBSP's obligation to be so limited given that the MLPA disclaims a duty on Plaintiff's part to examine loan files. MLPA §§ 4(e), 7(a). DBSP bought the loans, performed due diligence on them, selected them for inclusion in the Trusts, and made representations and warranties about them, and was therefore uniquely positioned to be aware of breaches. DBSP's reading would also imply, counterintuitively, that section 2.03(a) of the PSA obligates the Trustee to "notify" DBSP of breaches that DBSP has already discovered before it may enforce DBSP's repurchase obligation with respect to those breaches.

In any event, "[t]he issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007); *see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."). In light of the foregoing discussion, it would be premature for the Court to conclude that Plaintiff's notice obligation was sufficiently material that any nonperformance of that obligation forecloses its ability to sue to enforce DBSP's repurchase obligation with respect to the breached loans that DBSP independently discovered.

* * *

To summarize, because Plaintiff adequately alleges that DBSP discovered breaches and failed to repurchase the defective loans, and because its entitlement to sue to enforce DBSP's repurchase obligation with respect to those loans does not require prior notice, the Court need not address the parties' arguments concerning the timing and adequacy of the notices that Plaintiff provided. Discovery may reveal that DBSP was, in fact, unaware of certain breaches, meaning that its obligation to cure them or repurchase the defective loans would be triggered only upon notice. If so, the adequacy and timing of Plaintiff's notices would remain relevant.

A final note on this subject: The basic thrust of DBSP's argument is that Plaintiff's "discovery" theory cannot be correct because it is too easy to plead. Def. Br. at 5, 18. It is true that the repurchase protocol is a specific pre-suit remedy that the parties bargained for and which Plaintiff should not be able to avoid easily. It is also true that, under the foregoing interpretation of the Agreements, Plaintiff's allegations that DBSP discovered breaches and failed to repurchase the defective loans would effectively allow it to sue DBSP without first asking it, out of court, to abide by its contractual obligations. (Of course, in this case, Plaintiff actually did notify DBSP of alleged breaches.) But if the parties intended to impose such a demand requirement, they could have done so clearly. *See Lehman XS Trust, Series 2006-4N*, 2014 WL 108523, at *2 (describing explicit "accrual provision" in purchase agreement). And the ease with which Plaintiff has surmounted contractual obstacles to litigation is directly related to the pervasiveness of the breaches discovered during the forensic review. If that review had uncovered only a few breached loans, for instance, Plaintiff's allegations that DBSP conducted industry-standard due diligence on the loan pools might not "nudge[] [its] claims across the line

32

from conceivable to plausible." *Twombly*, 550 U.S. at 570.  But the Court is required to accept Plaintiff's allegations of widespread breaches as true.

### C.  Plaintiff's Declaratory Judgment Claims Are Dismissed

Plaintiff seeks a declaratory judgment that DBSP must reimburse it for expenses incurred in enforcing its remedies under the Agreements, including the costs of suit, attorney's fees, and other expenses. *E.g.*, WM2 Compl. ¶ 141.  Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "It is within the broad discretion of the trial court whether to exercise declaratory jurisdiction." *DBALT 2006-OA1*, 958 F. Supp. 2d at 507 (quoting *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006)) (internal quotation marks omitted); *see Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005); *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 505 (2d Cir. 1968).

Plaintiff's declaratory judgment claims allege entitlement to expenses under the Agreements themselves. *E.g.*, WM2 Compl. ¶ 89 (asserting that DBSP "agreed to reimburse the Trustee for the expenses of enforcing DBSP's obligations").  Plaintiff therefore has the right to seek the reimbursement it requests as part of the coercive remedy it is pursuing under its breach of contract claims. *See DBALT 2006-OA1*, 958 F. Supp. 2d at 507 ("Plaintiff has acknowledged its rights under the relevant Agreements to pursue this remedy.").  Accordingly, declaratory relief is unnecessary, and Plaintiff's request for such relief is dismissed.[13] *See Am. Auto. Ins. Co.*

---

[13] Plaintiff's contention that its declaratory judgment claim states a valid Article III "case or controversy" may have merit, Pl. Opp. at 30, but that jurisdictional argument is irrelevant to whether declaratory relief is necessary or appropriate in light of Plaintiff's existing claims for coercive relief. *See Muller*, 404 F.2d at 505 ("[E]ven when justiciability is present the court is not required to proceed with the declaratory judgment action . . . .")

33

*v. Advest, Inc.*, No. 08 Civ. 6488 (LAK), 2009 WL 3490060, at *1 n.1 (S.D.N.Y. Oct. 28, 2009)

("Where . . . the dispute may be resolved in a direct action for coercive relief, courts may dismiss

the declaratory judgment complaint."); *see also Johnson v. McCuskey*, 72 F. App'x 475, 478 (7th

Cir. 2003) ("Declaratory judgments are not meant simply to proclaim that one party is liable to

another."); 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2751 (3d ed.

2013) (a declaratory judgment is "a means by which rights and obligations may be adjudicated in

cases involving an actual controversy that has not reached the stage at which either party may

seek a coercive remedy and in cases in which a party who could sue for coercive relief has not

yet done so").

## IV.    CONCLUSION

For the foregoing reasons, DBSP's motions to dismiss are granted in part and denied in part.  Plaintiff's declaratory judgment claims, contained in the fourth causes of action in each Complaint, are DISMISSED with prejudice.

A scheduling conference in these four actions is hereby set for April 25, 2014 at 11:30 AM in Courtroom 906 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York.  Pursuant to the Court's Individual Rules, the parties must confer and file a joint Proposed Civil Case Management Plan and Scheduling Order no later than seven days prior to the conference.  The parties shall use the form available on the Court's website.[14]  The parties are also directed to submit, by the same date, a proposed order providing for the consolidation of these four actions going forward.

This resolves Docket No. 16 in No. 13 Civ. 1869, Docket No. 16 in No. 13 Civ. 2053, Docket No. 13 in No. 13 Civ. 2828, and Docket No. 13 in No. 13 Civ. 3687.

SO ORDERED.


Dated:  March 20, 2014
         New York, New York

_____
ALISON J. NATHAN
United States District Judge

---

[14] http://nysd.uscourts.gov/judge/Nathan.