UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                            :

ACE SECURITIES CORP. HOME EQUITY  : Docket #13cv01869
 LOAN TRUST, SERIES 2007-HE3,       1:13cv-01836-AJN-GWG
                                  :
              Plaintiffs,
                                  :

         - against -
                                  :
DB STRUCTURED PRODUCTS, INC.        New York, New York
                                  :  July 8, 2015
              Defendants.
---------------------------------:


                   PROCEEDINGS BEFORE
           THE HONORABLE GABRIEL W. GORENSTEIN,
      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:          HOLWELL SHUSTER & GOLDBERG LLP
                         BY:  MICHAEL S. SHUSTER, ESQ.
                              DWIGHT HEALY, ESQ.
                              BRENDON DeMAY, ESQ.
                         125 Broad Street, 39th Floor
                         New York, New York 10004
                         (646) 837-5151


For Defendants:          SIMPSON THACHER & BARTLESS
                         BY:  DAVID J. WOLL, ESQ.
                              CHRISTOPHER HULTMAN, ESQ.
                         425 Lexington Avenue
                         New York, New York 10017
                         (212) 455-2000



Transcription Service:   Carole Ludwig,*Transcription Services*
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

APPEARANCES cont'd:

```
For Defendants:          SWEENEY GALLO REICH & BOLTZ LLP
                         BY:  DAVID GALLO, ESQ.
                         95-25 Queens Blvd.
                         Rego Park, New York 11374
                         (866) 415-9391
```

<u>INDEX</u>

**E X A M I N A T I O N S**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
1                                                      4

2              THE CLERK:    The case of In re Ace Securities

3    Corporation, Docket 13cv1869.  Counsels, please state your

4    appearances.

5              MR. MICHAEL SHUSTER:    Michael Shuster for the

6    plaintiff.

7              MR. DWIGHT HEALY:    Dwight Healy for the

8    plaintiff.

9              MR. BRENDON DeMAY:    Brendon DeMay for the

10   plaintiff.

11             MR. (inaudible):  (inaudible) for the plaintiff.

12             MR. DAVID WOLL:    Oh, I'm sorry, jumped the gun.

13   Good afternoon, Your Honor, David Woll for the defendant.

14             MR. CHRISTOPHER HULTMAN:    Chris Hultman for the

15   defendant.

16             MR. DAVID GALLO:    David Gallo for defendant.

17             HONORABLE GABRIEL W. GORENSTEIN (THE COURT):

18   Okay, welcome everyone.  We're here based on a joint letter

19   dated June 24th.  You can be seated if you're not speaking.

20   I think the simple thing is to go through the issues.  I did

21   read the letter.  It's probably going to help to read again

22   what's going on.

23             As to the first issue, I couldn't tell what was

24   going on.  Is this just a dispute about dates and whether

25   July 31st is okay.  Or do you want me to order July 31st?
```

```
 1                                                    5
 2  Where are we on this, Mr. Shuster?
 3              MR. SHUSTER:   Well, Your Honor, the reason that
 4  we're requesting an order requiring the defendant to produce
 5  the material by July 31st is two-fold.
 6              One, it's, frankly, material that should've been
 7  produced a long time ago.  It is a substantial amount of
 8  very highly relevant material, and it is inexplicable to me
 9  why it wasn't produced earlier.
10              And second, in our initial discussions with my
11  counterparts, they initially said they thought they would be
12  able to complete their production of these materials in the
13  middle of June.  And that date has now obviously moved
14  considerably.  And given the importance of the volume of
15  these documents we would just like to set a date certain by
16  which they will be produced.
17              THE COURT:   Okay.  So it's not a question of
18  scope; it's the date, right?
19              MR. SHUSTER:   I don't believe it's a question of
20  scope.
21              THE COURT:   Okay.  Well I think the explanation
22  here was sufficient.  I'll order them produced by July 31st.
23  Can we go to issue number two?
24              MR. SHUSTER:   Issue number two concerns -- so
25  there are two affiliates of Deutsche Bank.  One is called DB
```

```
1                                                         6
2   Home, formerly Chapel and the other, it's MortgageIT, and in
3   the last conference with Your Honor, it was established that
4   documents of those affiliates would be produced.  We then
5   had meet-and-confers and have arrived at an impasse at a
6   date range for which searches should be conducted and
7   documents should be produced as to one of the two
8   affiliates, which is MortgageIT.
9           The defendant's position is that the cutoff date
10  should be February 2009, which is a date at which apparently
11  MortgageIT was merged into a Deutsche Bank; its operations
12  were merged into Deutsche Bank.  We don't dispute that but
13  the same personnel who were at MortgageIT were now in within
14  the defendant and they continue to do work with respect to
15  MortgageIT.
16          And to the extent they have responsive documents
17  bearing on their work for MortgageIT that fall within the
18  search parameters, we think those documents should be
19  produced right up until the date of the complaint, which is
20  the same timeframe for which the other affiliates documents
21  are being produced, and for which the defendant's and the
22  plaintiff's documents are being produced.
23          THE COURT:   I thought they said -- I'm not sure
24  why you're not addressing this.  Maybe I'm misunderstanding.
25  I thought their point on this was that they'd ceased loan
```

```
 1                                                    7

 2   operations on the date that the --

 3             MR. SHUSTER:  Well they ceased loan --

 4             THE COURT:  If I can finish my sentences, Mr.

 5   Shuster --

 6             MR. SHUSTER:  Oh, I'm sorry.  I apologize.

 7             THE COURT:  -- we're on the record and we're

 8   being recorded.  If someone wants to order a transcript we

 9   can't have two people talking at once.

10             They said that there -- they had ceased lending

11   operations on the date that they're proposing two months

12   earlier, and that the last loan they originated that was in

13   this action was two years earlier.  So that to you is

14   irrelevant?

15             MR. SHUSTER:  I'm sorry, Your Honor, I didn't

16   hear your --

17             THE COURT:  That's irrelevant to you?

18             MR. SHUSTER:  That the reason why they would

19   still have discoverable and potentially relevant documents

20   is they continued to monitor the loans.  They continued to

21   monitor loan performance, information continued to come in

22   to them concerning the loans concerning potential breaches

23   on the loans, and the quality of the loans, the quality of

24   origination of the loans.

25             THE COURT:  So their statement that they ceased
```

8

1

2  lending operations, to your mind, doesn't include monitoring

3  of loans?

4          MR. SHUSTER:   It doesn't include monitoring of

5  loans or generating or receiving information concerning

6  potential defects in the loans or breaches of reps and

7  warranties.

8          THE COURT:   Mr. Woll?

9          MR. WOLL:   Yes, Your Honor, thank you.  So the --

10  what we're trying to do is we're trying to be practical here

11  in terms of the information Your Honor just referred to and

12  the fact that the search terms that we're agreeing to run up

13  to February 2009, which as you pointed out, Your Honor, is

14  the -- postdates the lending operations in any of the loans

15  at issue and these securitizations.

16          The search terms include things like DBSP and

17  Deutsche.  And if we run those search terms on MortgageIT

18  people who then became effectively employees of Deutsche

19  Bank entities the numbers are just going to go through the

20  roof.  And it's going to go away from the original purpose

21  of the --

22          THE COURT:   Give me a second.  I just suddenly

23  got a leg cramp.  I think I need to try walking it off for a

24  second.  It doesn't happen very often but when it does it's

25  kind of painful.

```
 1                                                      9
 2           (Pause.)
 3           THE COURT:   Okay.  I can now focus on what you're
 4  saying.
 5           MR. WOLL:   So we're already agreeing to run the
 6  search terms up to February 2009 which I believe hits on
 7  something like 200,000 documents.  The --
 8           THE COURT:   We should focus on the goal here.
 9           MR. WOLL:   Yeah.
10           THE COURT:   It sounds like the goal is to get
11  documents from the MortgageIT people that relate to
12  potential breaches of the loans at issue in this case.  Is
13  that right, first of all, Mr. Shuster?
14           MR. SHUSTER:   Yes.
15           THE COURT:   That's why we're doing this.
16           MR. DeMAY:   That's why we're doing this.
17           THE COURT:   So what's your suggestion for how to
18  do this or do you think that there's no possibility they
19  have such documents?  Because Mr. Shuster certainly doesn't
20  think that's the case.
21           MR. WOLL:   Right.
22           THE COURT:   Where's the disconnect?
23           MR. WOLL:   Well, I think the -- let me address my
24  suggestion based on what Mr. Shuster said before and the
25  questions Your Honor asked.  I mean, to the extent that the
```

                                                                10

 1
 2  real goal is after MortgageIT's operations ceased in
 3  connection with lending activities and, you know, the loans
 4  at issue they want to get documents that monitored the
 5  performance of those loans.  I think, but would be happy to
 6  confirm -- because we didn't specifically discuss this
 7  before -- I think that is something that would be picked up
 8  through discovery of DBSP, the defendant.
 9          And what we're trying to avoid is running search
10  terms with Deutsche basically in the name that's going to
11  hit on, you know, basically every e-mail these people wrote
12  since it's in their signature block and their address field.
13          So I think the goal of the MortgageIT subpoena
14  originally was to get discovery from MortgageIT as a
15  nonparty originator in connection with the loans that
16  originated.  And we certainly cover that period.
17          And for this monitoring tail, if you will, I guess
18  what I'd suggest is we confirm that to the extent monitoring
19  continued that that will be picked up through the -- or has
20  been picked up through the searches we've already run.  And
21  that would avoid running Deutsche on all these people's e-
22  mails after they became, you know, Deutsche employees,
23  effectively.
24          THE COURT:   Are you running Deutsch on other
25  people's dealing?

1

2          MR. WOLL:   But we're not running --

3          THE COURT:   Is it that -- hold on.  Is it that

4    you are just trying a limited number of custodians you're

5    running Deutsch on?

6          MR. WOLL:   For purposes of MortgageIT, yeah,

7    we're trying to limit the date range where we continue to

8    run Deutsche as effectively as a counterparty to MortgageIT

9    as an originator.  So what we are doing for the MortgageIT

10   and for Chapel is up until a certain date we're running

11   Deutsche.  But on the DBSP documents themselves we're not

12   running the term DBSP because that would, you know, generate

13   --

14         THE COURT:   So, okay.  So I guess I understand

15   the following concept which is that if you're trying to

16   figure out what the e-mails are that have to do with them

17   honoring this loan it's crazy to start running Deutsche once

18   they've become part of Deutsche.  But then it seems to me

19   you should come up with some other suggestion for how to get

20   at these.  It's your responsibility to conduct a reasonable

21   search, obviously, of these custodians for this.  So it

22   seems to me you need to come up with a plan, no?

23         MR. WOLL:   Right.  And we, I agree, Your Honor,

24   and we had proposed that we run the loan terms, the loan

25   IDs, and the securitization terms which should pick up any

12

monitoring documents to the extent they're not already being

picked up through the DBSP searches.  And that's something

that we're prepared to do for the MortgageIT custodians up

to the date of the complaint.

THE COURT:  I mean, you know, my view of the big

picture of all this is that it's the custodian's or the

document producer's responsibility to answer the document

requests and to do a reasonable effort to find them.  In the

old days, that reasonable effort had to do with pawing

through filing cabinets; now it has to do with search terms.

You know, in the old days, if you didn't come up

with a document and it turned out you hadn't done a good job

going through the filing cabinets, you got in a lot of

trouble.  And I suppose you can get in trouble now for the

search terms.  What's different now is people are finding

out the search terms in advance and I think that's good.

But it now puts a responsibility as well on the plaintiff if

they want it, to say why -- what they're proposing is

unreasonable.  So I guess I'd turn back to you, Mr. Shuster.

MR. SHUSTER:  Well, the I mean, the search terms

here across the board have been pretty heavily negotiated.

And the search terms that the defendant would be running for

the MortgageIT custodians for the period after February '09

are not different from ones they're running for other

13

1

2    custodians.  They're not just running DB; there's always

3    connectors and qualifiers to insure that we're not picking

4    up every document that says DB, or Deutsche Bank.

5              THE COURT:  I assume you're willing to do on

6    these people what you're doing for other Deutsche Bank

7    custodians or not?

8              MR. WOLL:  Your Honor, we are, except that the

9    reference to the DB terms or the Deutsche Bank or DBSP

10   terms, I don't believe we're running DBSP within X for the

11   DBSP custodians.  Because again, that's going to bring back

12   to my --

13             THE COURT:  I know.  My question is this:  I

14   thought I just heard, and maybe I misheard, Mr. Shuster's

15   saying you should at least do for these people what you're

16   doing for the other Deutsche Bank people in terms of trying

17   to find this.  So what's, you know, I don't know enough

18   about this.  Usually parties could get this kind of level of

19   detail out.  But if you can't, I'll get involved.

20             So is there something that you're doing for other

21   Deutsche Bank people or DBSP people that you're not doing

22   for this unit?

23             MR. WOLL:  I think the only exception is the

24   Deutsche Bank terms with connectors after a certain date.

25   We're proposing the --

```
 1                                              14

 2          THE COURT:   You're, I mean, you're actually, I

 3    mean, it just seems weird, unless I'm misunderstanding you,

 4    that you're telling me, oh, it's fine to do it, to do those

 5    kinds of searches for the DBS people but we don't want to do

 6    it for the MortgageIT people who became part of DBSP.  Am I

 7    misunderstanding you?

 8          MR. WOLL:   I think you are, Your Honor, and I

 9    apologize.  I'm probably not being very clear.

10          THE COURT:   Probably my fault.  Go ahead.

11          MR. WOLL:   I don't believe we are running, and

12    counsel will correct me if I'm wrong, I don't think we are

13    running DBSP within, you know, five words of X for DBSP.  So

14    because this was MortgageIT as a counterparty we undertook

15    to do that.  And all we're trying to do is have a rational

16    cutoff date for that once MortgageIT stops operations and

17    became affiliated with Deutsche Bank.  And --

18          THE COURT:   Well, I think it's perfectly rational

19    to stop the DB-type search once they become part of Deutsche

20    Bank.  That makes complete sense.  But as I say, then you

21    need something, if you don't already have it, that's going

22    to allow you to come up with the documents that we care

23    about, which are these monitoring documents.

24          MR. WOLL:   Right, and that, Your Honor, I would

25    propose -- I'd be happy to -- we had proposed this before.
```

```
 1                                                    15
 2  I'd be happy to discuss it further with counsel but I think
 3  if we run the loan-specific terms and the securitization
 4  terms. that will identify the loans, it's like 85 or so
 5  MortgageIT loans.  And to the extent they were monitored I
 6  think we'll come up with those documents, so.
 7            THE COURT:  Mr. Shuster?
 8            MR. SHUSTER:  Yeah, Your Honor, on this issue the
 9  real question I think is the cutoff date.  The last --
10            THE COURT:  Okay.  When you say the cutoff date
11  you mean the cutoff date in which you want them to actually
12  run Deutsche Bank, DB-type terms?
13            MR. SHUSTER:  The -- to run the entire range of
14  search terms --
15            THE COURT:  Right.  Their problem is that is they
16  say it's crazy to run those terms when they're now a part of
17  Deutsche Bank and I agree with them.  So having heard that,
18  do you think you guys can work this out?  In other words, I
19  want you to get your documents but I understand why it's
20  crazy to do this once they're part of Deutsche Bank.  It's
21  going to turn up too much if it's part of their signature
22  line.
23            MR. SHUSTER:  As long as we can get -- as long as
24  it's clear that they have to search for the same period of
25  time that they searched for, the other Deutsche Bank
```

                                                                    16

 1  affiliate, which is DB home and for Deutsche Bank's

 2  structured products itself perhaps we can work it out we can

 3  certainly try --

 4          THE COURT:   Okay.   This is not a time issue; this

 5  is a search-term issues from your point of view, right?

 6          MR. WOLL:   That's correct, Your Honor.

 7          THE COURT:   So, yeah, the time it seems obvious

 8  that if there's any possibilities people are still

 9  monitoring these loans, it should be searched for.   So

10  that's the end of that.   And the question is what are the

11  right search terms?   And I don't have enough between the two

12  of you and this piece of paper to figure it out.   So take

13  another crack at it and if you can't solve it, you give me

14  your search terms, and you give me yours, and I guess I'll

15  pick.   I don't know what else to do.

16          MR. WOLL:   Thank you, Your Honor.

17          MR. SHUSTER:   So Your Honor, the third issue that

18  we have also goes to search terms.   And if the Court wishes

19  we can attempt to do the same thing Your Honor just

20  described and then -- but where we landed on this one was

21  that we had an agreement and an understanding that the

22  defendants would run for their affiliates, which are DB home

23  and MortgageIT, a terms that is described in the third line

24  of our section which is --

 1                                                                  16

 2  affiliate, which is DB home and for Deutsche Bank's

 3  structured products itself perhaps we can work it out we can

 4  certainly try --

 5          THE COURT:   Okay.   This is not a time issue; this

 6  is a search-term issues from your point of view, right?

 7          MR. WOLL:   That's correct, Your Honor.

 8          THE COURT:   So, yeah, the time it seems obvious

 9  that if there's any possibilities people are still

10  monitoring these loans, it should be searched for.   So

11  that's the end of that.   And the question is what are the

12  right search terms?   And I don't have enough between the two

13  of you and this piece of paper to figure it out.   So take

14  another crack at it and if you can't solve it, you give me

15  your search terms, and you give me yours, and I guess I'll

16  pick.   I don't know what else to do.

17          MR. WOLL:   Thank you, Your Honor.

18          MR. SHUSTER:   So Your Honor, the third issue that

19  we have also goes to search terms.   And if the Court wishes

20  we can attempt to do the same thing Your Honor just

21  described and then -- but where we landed on this one was

22  that we had an agreement and an understanding that the

23  defendants would run for their affiliates, which are DB home

24  and MortgageIT, a terms that is described in the third line

25  of our section which is --

```
 1                                                    17
 2              THE COURT:   I see it, DB not within two of home.
 3              MR. SHUSTER:   Okay.   So after really some months
 4    defendants came back to us and said due to an issue with
 5    their document vendor they can't run that term and they're
 6    not proposing to run any sort of equivalent term.   They
 7    haven't proposed an alternative and they say if they run a
 8    more -- a less limited term they're come up with a higher
 9    volume of documents.
10              And our response to that is, if your vendor is
11    unable even to run the term that we agreed, then either they
12    should solve that problem, which vendors can usually do, or
13    you have to deal with a larger volume of documents that
14    would be uncovered pursuant to a more expansive search term.
15              But we think we're entitled to a search for the
16    subject matter that would be covered by the string of search
17    terms starting with DB not within two home.
18              THE COURT:   Okay.   I don't know, again, I have to
19    look at this from the perspective of what documents you're
20    hoping to get out of this search term and if you can't do it
21    with this one, what are you doing that's reasonable -- I'm
22    now turning to Mr. Woll -- what are you doing that's
23    reasonable to try to get at the documents if you can't use
24    the search term?
25              MR. WOLL:   The only search term where we're
```

1

2  saying we do not want to run the Chapel MortgageIT documents

3  are is just basically the letters DB within X of certain

4  other keywords.  And the original proposal which we said we

5  would agree to, subject to confirming that it didn't bring

6  back too many search terms, was DB but not home.  And the

7  reason for that -- and I apologize for burdening the Court

8  with this -- but DB home became the name of the business

9  line that Chapel and then at some point MortgageIT were

10  operating under.

11          So that's why the plaintiff proposed and we agreed

12  if we can do DB but not home then that might make sense, but

13  --

14          THE COURT:   DB but not within two of home.

15          MR. WOLL:   Right.

16          THE COURT:   And what are you trying to get at

17  with -- what are you -- what's the big picture?  What

18  documents are you trying to get at?

19          MR. WOLL:   I think the -- I mean, we will get at

20  the documents because we're still searching for Deutsche and

21  DBSP, we're just saying that DB brings back hundreds of

22  thousands and documents above and beyond what we would

23  otherwise need to review.  And we don't need that term.

24          THE COURT:   Because why?  What kind of DB is

25  something -- what is DB that it keeps showing up?

```
 1                                                      19
 2              MR. WOLL:   Oh, why does that?  I don't
 3    specifically know.  I know we ran the test but exactly why
 4    that comes up versus others, I'm not sure.  So again, we're
 5    trying to put some rational limit on it but -- and we will
 6    run terms that get at Deutsche and DBSP.  But the DB term
 7    just doesn't work.
 8              THE COURT:   And the reason your vendor can't run
 9    this, do you know, understand it?
10              MR. WOLL:   Beyond knowing that record told us
11    they don't have that capability, I don't have more
12    information on that.  But I mean, Mr. Shuster seems to think
13    that we could convince the vendor do fix it.  And, you know,
14    we have asked the vendor and it's told us no.  I'd be happy
15    to ask again, but I think the answer's now because with --
16              THE COURT:   Maybe it would be helpful for their
17    IT person to talk on the phone with you guys and the other
18    IT person so that they can maybe be convinced of why this is
19    a real problem.  And then if not, I guess someone comes back
20    to me.  The fact the people parties agree on terms, to me is
21    not the be-all and end-all of everything, if other issues
22    arise that become problems.
23              So I don't want to stand on ceremony.  Again, my
24    goal is to try to get at documents that are responsive to
25    the document request and relevant to the case.  And if you
```

can come up with a reasonable way to do it, even if it's not
part of the (indiscernible) protocol, that's not going to be
a problem for me.  I don't want you to be put to an undue
burden of 200,000 documents have failed and maybe 5 percent
of those.

　　　　So I don't know -- I don't know where to leave
this, Mr. Shuster.  You know, I can haul in the IT people,
we can have a hearing.  I mean, what do you want me to do?

　　　　MR. SHUSTER:  No, I'm not asking the Court to do
that.  But even without the DB not within two home
limitation, the search term is DB -- would be DB home within
25 of words like craft, junk, garbage, that kind of stuff.
It's search terms that are being run elsewhere in this case.
It's certainly in other RMBS case like this.  And that we
know will turn up the responsive and relevant documents.

　　　　So if there's a large volume of those documents
it's because there's a large volume of documents that are
using language like that within 25 words of the phrase DB
home.  Again, with these --

　　　　THE COURT:  Is that what the 125,000 and the
110,000 is?

　　　　MR. SHUSTER:  Those are -- those are the
defendant's numbers, but I guess --

　　　　THE COURT:  No, is that running the terms like

1

2 garbage and so forth?

3          MR. SHUSTER:   Yes, I believe so.

4          THE COURT:   And the problem?  Well, let me just

5 make sure.  And the problem with those documents is that

6 they're not -- they're both DB and non-DB?

7          MR. WOLL:   Your Honor, first of all, I got

8 clarification from my colleague about what the DB problem

9 is.  And that is because the e-mail addresses are DB.com.

10 So that's why we get a lot more e-mails when we use DB.  And

11 it's not DB within garbage only.  It's DB within purchased,

12 DB within fall, DB within drop.  It's a lot of different

13 terms.

14          We ran the test to see how many additional terms

15 we'd get if we did DB versus running Deutsche or DBSP and

16 that's where we came up with the 125,000.  We haven't

17 reviewed the 125 so I can't tell you that, you know, exactly

18 what's in those documents.  But again, we think if we can,

19 you know, limit it to Deutsche or DBSP or if the IT people

20 can figure out how to do it, you know, without home --

21          THE COURT:   Why don't the two of you IT people

22 either get in a room or on the phone and talk this thing out

23 and see if you can figure out a way to get what they want?

24 And then if you can't, come back to me.  And when you come

25 back to me I need, I'm going to need, extreme detail.  I

```
 1   don't know what else to do.

 2          All right.  Mr. Shuster, you're done with that

 3   one?

 4          MR. SHUSTER:   Yes, Your Honor, thank you.

 5          THE COURT:    Number 4 is going to have to be

 6   briefed so what's your proposal?

 7          MR. SHUSTER:   Okay.  Well what I wanted to do on

 8   number 4 was actually provide -- show Your Honor some

 9   documents to show that the activities over which the

10   defendant now want so place the cloak of privilege and work

11   product were activities that were ongoing well before breach

12   notices were sent to the defendant in this case, or others.

13   It was a business function.  It started at least the

14   beginning of 2008 if not in 2007 but only business people

15   were involved and, you know, I think under the case law it's

16   not privileged or work product material.  So that's the

17   argument I was going to make.

18          If it needs to be briefed, then I'll make the

19   argument in the briefing.

20          THE COURT:    Great.  When can you file it?

21          MR. WOLL:   I guess we're going to, since our

22   motion to compel, we'll file it --

23          THE COURT:    I mean if you want I could -- it's

24   their burden so it's kind of a weird situation.  But since
```

                                                                    23

 1

 2   you have a lot of information that might --

 3            MR. SHUSTER:   Yeah, no, we'll file.  We'll file.

 4   I don't think we need 30 days.  Let's get a move on.  Can we

 5   commit to like, what's today?  Wednesday --

 6            THE COURT:   July 8th.

 7            MR. SHUSTER:   July 8th so Friday would be the

 8   10th.  So can't we say Friday the 24th, Monday the 27th?

 9   Okay.  Monday the 27th.

10            THE COURT:   The 27th.  Okay.  That's two days shy

11   of three weeks.  I assume we'll have to give you, Mr. Woll,

12   the same amount of time?

13            MR. WOLL:   Yes, Your Honor, I did have an

14   additional thought about the schedule.

15            THE COURT:   Okay.

16            MR. WOLL:   And that is, there are a lot of

17   privilege issues that I think go both ways here.  Because

18   HSBC is withheld a number of documents on the same or

19   similar grounds in terms of evaluation of repurchased

20   demands.  And so I'm happy to, you know, do it one other

21   time or it might make sense to --

22            THE COURT:   No, do it all at once.

23            MR. WOLL:   Yeah.

24            THE COURT:   Pre-motion conference waived.  The

25   same schedule for you.  You can file your motion July 27th.

```
 1                                                    24
 2  Sound good?
 3          MR. WOLL:   Yes, Your Honor, and then we'll
 4  respond to each other and then three weeks thereafter?
 5          MR. SHUSTER:   Two weeks, three weeks.
 6          THE COURT:   Three weeks less two days.  I think
 7  that's what I figured out.  The 27th, Monday, so that means
 8  you get the advantage of filing on a Friday and then the
 9  weekend.  August 14th for the opposition.  What do you think
10  for reply?  A week or more than a week?
11          MR. SHUSTER:   A week is fine, ten days.
12          MR. WOLL:   Maybe, how about --
13          THE COURT:   Just three weeks.
14          MR. SHUSTER:   Ten days?
15          MR. WOLL:   I was going to say ten days, yeah.
16          THE COURT:   Okay.  That takes us to the 24th,
17  that's what you want?
18          MR. SHUSTER:   Yes.
19          THE COURT:   Okay.  July 27, August 14, August
20  24th.  Okay.  Now the party opposing the motion to compel,
21  you know, has the burden.  It has sometimes happened in the
22  past that replies are requested.  If so, why don't you just
23  try to agree on it and maybe just send a letter or whatever
24  you have to do.  I won't object as long as you're both
25  agreeing, okay?
```

1

2          MR. SHUSTER:   Your Honor, while we're -- before

3  we move on to issue number 5, in connection with issue

4  number 1 we ask the Court to issue an order requiring

5  production of the materials by July 31.  And then setting a

6  conference for two weeks after completion of that so that we

7  could reset some of the dates of the case schedule.

8          THE COURT:   Why don't you just write a joint

9  letter if you can't agree computing letters, okay?

10         MR. WOLL:   Okay.

11         THE COURT:   If you ever need a conference, let's

12 do it.  But if it's just scheduling then I'd rather have the

13 parties --

14         MR. SHUSTER:   I do think we'll be able to work

15 that out, actually, optimistic.  Issue number 5, this is --

16         THE COURT:   Okay.  Let me give you my big picture

17 on this, okay?  I think we need to distinguish to some

18 degree between true affirmative defenses and regular old

19 defenses.  And included in the regular defenses are things

20 like the plaintiff is not going to be able to prove its

21 case.

22         And I would include in that things like, oh, we

23 the defendants didn't cause this problem; some other person

24 caused this problem.  That's not an affirmative defense.

25 That's saying when it comes down to the causation element or

1
2  whatever the cause of action is, you're not going to show
3  that we caused this problem.  Or defense, like the
4  plaintiff, is in its own material breach.  Well you can only
5  collect on a breach of contract claim if you substantially
6  performed.  So it's not that the defendant has an
7  affirmative burden to prove that the plaintiff failed
8  perform.  The plaintiff has the burden of proving
9  performance, okay?
10         So there are some people out there that call these
11  negative defenses because all they're doing is saying,
12  plaintiff, you're not going to be able to prove, you know,
13  the elements of your claims here.
14         When it comes to true affirmative defenses, like
15  statute of limitations, maybe something like mitigating
16  damages, but that's in kind of its own category, sometimes
17  plaintiffs are at a disadvantage because they don't know
18  what the facts are that support these defenses.  And the
19  reason they don't know the facts is that unlike plaintiffs,
20  defendants asserting affirmative defenses don't have to make
21  factual allegations to support that defense.
22         So for resample, the statute of limitation, they
23  don't have to say, oh, you know, this claim accrued on X
24  date and you filed on X date and to give the facts as to why
25  it accrued on X date.  So sometimes that puts the plaintiffs

1                                                                27

2    in the dark and one has sympathy for them, though the answer

3    to it may not necessarily be a 30(b)(6) deposition.  The

4    answer, in my experience, has usually been a limited

5    contention interrogatory not requiring them to marshal the

6    evidence to support the defense, but to state the factual

7    allegations that they're making if it's one of these

8    situations where the plaintiff literally doesn't know what

9    this defense is and how it applies to this case.

10          So that's normally the better way to solve it than

11   to try to do it through a 30(b)(6) deposition which is

12   really going to be someone who has been spoon-fed

13   information by a lawyer as to why we think the statutes of

14   limitation defense, you know, applies in this case.

15          So with that big picture, tell me what's going on

16   here and what you think the solution is, Mr. Shuster?

17          MR. SHUSTER:  I'd like to take a moment to think.

18          THE COURT:  Okay.  I know I've sprung this on

19   you.

20          MR. SHUSTER:  No, no, well, I mean, the main

21   focus here, I don't think these are sort of classic,

22   frankly, affirmative defenses of the type that you

23   described.  I think these are various -- there's a lot of

24   factual arguments that are couched as affirmative defenses

25   understandable and a common practice.  But we are in the

1
2    dark about what facts defendants believe do or could support
3    those arguments.  They --
4         THE COURT:   And if I were you, my fear would be
5    that they were going to ask for a jury instruction on this
6    purported defense.
7         MR. SHUSTER:   Absolutely.
8         THE COURT:   Out of nowhere.  So one way that,
9    again, in the past I've used to solve this is to, as part of
10   this contention interrogatory, let them say we do not intend
11   to ask for a jury instruction as to this defense.  You know,
12   a classic example is plaintiff fails to state a claim, so
13   that's an easy one.
14        Well, you don't really need to know why you think
15   that they failed to state a claim because that'll come up in
16   summary judgment, or judgment on the pleadings, whatever it
17   is.  You just need to know that there's not going to be some
18   instruction that's requested.
19        And if they're willing to say it for any
20   particular defense we won't be seeking a jury instruction,
21   does that solve your problem, or some of them, maybe?
22        MR. SHUSTER:   I'd have to go and look at, you
23   know, look at them again carefully.  It might.  Another
24   problem, another issue we have, frankly, is that some of
25   these affirmative defenses we don't think or we think raise

1

2   issues that are just not issues in the case, that are not

3   proper defenses, that are not proper, you know, defenses --

4        THE COURT:    Right.   It might be enough to just

5   know what the factual contentions are, right?

6        MR. SHUSTER:    It might be.

7        THE COURT:    And then you can say, you know what,

8   they're never going to be able to prove those factual

9   contentions so what do I care, or whatever your view is.

10        MR. SHUSTER:    Right.   So but if you look at

11   something like --

12        THE COURT:    Let's get practical.   Tell me some

13   defenses.

14        MR. SHUSTER:    Right.   So let's say, you know,

15   they say that they cured breaches or breaches were cured.   I

16   don't know of any curers of any breaches.

17        THE COURT:    Okay.   So let's talk about that one,

18   it's the 6th affirmative defense.   I think that that's not

19   truly an affirmative defense.   I think what it is a way that

20   they're going to try to say that there is no breach here.

21   They're going to say we cured it.

22        That doesn't mean you're not entitled at some

23   point, and maybe even now, to know what particular reps and

24   warranties were cured.   However, it also might not be

25   unreasonable for them to say, you know what, we don't know

1
2  yet.  And, you know, that's something that's going to come

3  out as we do more discovery work in this case and so forth,

4  in which case, we might put off your ability to find out the

5  answer to that question until, you know, a more opportune

6  moment.

7            MR. SHUSTER:   Okay.  I mean, we're prepared to

8  proceed with that guideline.  And honestly, I don't think

9  that, you know, I don't think there's anything there now.  I

10  don't think there's going to be anything there later.  But

11  you know how lawyers are.  It was said, so I want to see

12  what's behind it.

13            THE COURT:   I mean, I think you're entitled to a

14  contention interrogatory at some point.  And maybe even now,

15  in which case their answer might be we don't know yet; we'll

16  supplement as necessary.  In which you say we want you to

17  list in interrogatory form, not 30(b)(6) form, any instance

18  in which you've cured a breach that's been specifically

19  alleged.

20            By the way, did you allege specific breaches in

21  your complaint?

22            MR. SHUSTER:   No, not in the complaint.  We

23  noticed a lot of specific breaches.

24            THE COURT:   Okay.  Right.  It's part of your

25  forensic review.

31

1

2          MR. SHUSTER:   Right.

3          THE COURT:   You're entitled to know that

4   information.  At what stage, I'm not sure yet, and maybe

5   that's something that we can talk about in a larger context

6   after we go through some more of these.  But I absolutely

7   agree you're entitled to know the answer to that.  I'm

8   saying this now without having let you spoke, Mr. Woll.  Do

9   you think they're never entitled to know it, or just not

10  entitled to know it now, or just not entitled to know it

11  through 30(b)(6) deposition?

12          MR. WOLL:   Your Honor, I think the contention

13  interrogatory is a very practical way to approach this.  I

14  think the answer to your question is I'm not saying they're

15  not entitled to know.  I think the 30(b)(6) is not the way

16  to go.  And in terms of timing, you know, some of the what

17  is, and is in the breach, is going to be determined, I

18  guess, by the expert discovery that they serve.

19          And if they, you know, identify their breaches

20  through expert discovery and they want to, you know, have us

21  then say did we cure any of these breaches.  At that point,

22  that might make sense.

23          THE COURT:   Okay.  I mean the thing one doesn't

24  want to happen and I don't think it's likely to happen here,

25  is that your response to which ones you cleared opens up

```
 1
 2   some factual issue that is not part of a document production
 3   or a deposition that already occurred.  It seems very
 4   unlikely.  Is that fair?
 5             MR. WOLL:   No, I think that's right and these --
 6             THE COURT:   That's the only downside to waiving
 7   to the experts.
 8             MR. WOLL:   Right.
 9             THE COURT:   Is we don't want to say, oh, gee, if
10   I had known you felt we cured that breach I would've asked
11   witness X about this or I would've asked for this particular
12   document.
13             MR. WOLL:   Right.
14             THE COURT:   The second thing it's not going to
15   happen.  I assume the first thing's not going to happen but
16   that's the danger.
17             MR. WOLL:   I think that's fair and, I mean,
18   these, as I think Your Honor indicated, I mean these are,
19   you know, affirmative defenses are put in the answer
20   because, you know, parties get nervous about waiving things.
21             THE COURT:   People seem to do it -- I don't know
22   why -- so then everyone has to do it.  Go ahead.
23             MR. WOLL:   No, but so anyway, that would be my
24   suggestion.  I think the contention interrogatory makes
25   sense perhaps, you know, after they've identified the
```

1

2  breaches for the cure issue and others that are tied to the

3  breaches.  Maybe that's the time we answer that.

4         THE COURT:  Is there a point at which you feel

5  you're going to be obligated to identify the breaches?

6         MR. WOLL:  Well, we have identified the breaches

7  and breach notices, loan by loan, in considerable detail.

8  So we know there's --

9         THE COURT:  Is that subject to change or not?

10        MR. WOLL:  It's subject to change.  The reality

11 is it'll change modestly because we do have expert re-

12 underwriters who are doing their own reviews of the loans

13 and they're certainly not going to agree foursquare with the

14 forensic, the pre-sued forensic reviews.  So there'll be

15 some degree of change but it'll be on the order of single-

16 digit percentages.

17        THE COURT:  I mean do you sitting here now know

18 of cures or are you just hoping that by the end of this you

19 have some?

20        MR. WOLL:  Yeah, I don't, I don't know whether

21 there was a cure in these cases.

22        THE COURT:  All right.  So I don't know that it

23 makes any sense to do this now.  I think it makes sense to

24 do it as part of the expert phase knowing that the

25 likelihood this is going to raise any actual factual

34

1   discovery issue that wasn't anticipated as it first was

2   zero.   Is that fair, Mr. Shuster?

3   

4          MR. SHUSTER:   Yeah, the only thing I would say is

5   I would not have anticipated that actually any expert would

6   have addressed the matter of cure.   Cure is a, you know, is

7   a factual issue of --

8          THE COURT:   No, no, but my point is that you're

9   going to be -- it's possible that you will withdraw some of

10  your claims of breaches as part of the expert's review  So

11  it might make sense to just know what the full universe is

12  of breaches.

13         MR. WOLL:   I think we know what most of the

14  universe is.  No, what I -- so, you know, practically what's

15  going on here, they're asserting cures; we look at this, we

16  say this is news to us, right?  I want to get someone on

17  their side to --

18         THE COURT:   Okay.

19         MR. WOLL:   -- give a very general answer that

20  shows they don't have any facts to support it.   Then at

21  least I know I don't have to pursue it, you know, in

22  discovery or via my experts.   Or I can move to, you know --

23         THE COURT:   Okay.   I think that's fair.   I think

24  that you've given them, you say specific notice of breaches.

25  It's not likely to change by any appreciable way.   On the

35

1

2  other hand, I don't want them to have to do this until we're

3  a little farther along in discovery.  So I think maybe, you

4  know, just before the end of the fact discovery period is

5  the time to do these contention interrogatories.

6          MR. SHUSTER:   That's certainly fair.  Thank you.

7  So the next one honestly raises --

8          THE COURT:   This is a causation issue.

9          MR. SHUSTER:   Right.  And the truth is, in our

10 view, there is no causation issue here.  The contract says

11 that if there's a breach that materially and adversely

12 affects the value of the loan or the certificate --

13 certificate holders' interest they're in, then they either

14 have to cure or repurchase.  We don't view that as turning

15 on -- we don't think this is a legitimate issue at all but

16 they do, they're going to raise it.

17          I do expect them to seek to introduce substantial

18 evidence on this point.  It wouldn't shock me if they tried

19 to introduce, in addition to fact evidence expert opinion

20 evidence and all of that.  And if they're going to say all

21 of this I think we're entitled to know what's behind it,

22 even though we still reserve as to our contractual and legal

23 argument that none of it is relevant to begin with.

24          THE COURT:   Okay.  Now the question is when and

25 how do you get to find out about the contentions on this?

1
2   That's really the question.  30(b)(6) doesn't seem like the

3   right way to do it; an interrogatory makes more sense.  And

4   maybe the question once again becomes when.  And I think

5   we're going to end up maybe at the same places we did with

6   the sixth affirmative defense.  What do you think?

7           MR. SHUSTER:   I think this stuff, they know, they

8   --

9           THE COURT:   They know now.

10          MR. SHUSTER:   Yes, yeah, they dealt with these

11  issues before.  They have appointed --

12          THE COURT:   No, but when you say they know --

13  well, I mean, let me hear from Mr. Woll.  Do you know now?

14          MR. WOLL:   Your Honor, no, not with respect to

15  the loans that they're actually going to claim breach on.

16  And let me just add, by the way, that although we're not

17  arguing about whether this defense is valid or not, I just

18  want to point out that the plaintiff, in addition to the

19  specific contractual remedy which we say they're limited to,

20  have argued that beyond that they could be entitled to

21  damages.

22          And so if anything, we disagree with that but if

23  they get to go beyond the contractual remedy then we would

24  certainly be in causation land.

25          But I think that the timing of this is again

37

1

2  something that, you know, we'd be willing to address nearer

3  to the end of fact discovery like you propose we --

4       THE COURT:  Well he says you know now so tell me

5  why you shouldn't have to answer it now.

6       MR. WOLL:  Well, I mean the -- until we see their

7  actual breaches to go through the discussion of which --

8       THE COURT:  When you say actual breaches, the

9  ones you have so far you're concerned they're going to

10  radically change when an expert goes through it?

11       MR. WOLL:  Well, I mean assuming -- if they're

12  having an independent expert look at this stuff then there

13  could be changes.  Maybe they'll, you know, maybe as Mr.

14  Shuster says, they'll be modest changes but I really don't

15  think we should get into a contention interrogatory until

16  we, you know, have some idea of what the breaches are.

17       MR. SHUSTER:  Two things:  One, on the claims we

18  have that are not purely under the re-purchase protocol as

19  it's described, it's a fairer argument.  I don't agree with

20  the argument but it's at least a more plausible argument

21  that they can make that there's some causation issue.

22       But they're making that.  I don't agree with it,

23  reserve all my rights.  But they're making the argument,

24  they're making the assertion.  These are macroeconomic

25  factors the Deutsche Bank has looked at, that Deutsche Bank

1

2 has experienced, that Deutsche Bank has commented on

3 internally, externally.

4          We have 4,000 loans, roughly rounded, at issue

5 here.  If we have 4,000 completely different loans they'd

6 make the identical arguments.  They're not going to make

7 arguments about real estate market crash, economic downturn,

8 and this and that, that get down to a granular level on

9 specific breaches on specific loans.

10          They're going to say that the market crash and all

11 these other factors caused all loans of various categories

12 to go down in value and they have views on that.  And that's

13 what I think we're entitled to.  That actually is fact

14 discovery and they want to have my experts address that --

15          THE COURT:    Fact discovery?

16          MR. SHUSTER:    Well to the extent they know what

17 is behind this.  To the extent they have a point of view on

18 their side, think I'm entitled to it because I want to --

19          THE COURT:    But why -- but what -- this is the

20 thing.  I imagined this, and maybe Mr. Woll, you'll tell me

21 otherwise, is that you're not going to conduct any fact

22 discovery on this.  What you're going to do is have an

23 expert that talks about all these things.  Am I right or am

24 I wrong?

25          MR. WOLL:    I think that's right, certainly on the

1
2  macro level I think that's --

3          THE COURT:   What else is there?

4          MR. WOLL:   Well I just wanted to comment.  I

5  don't think either of us are talking about on a loan-

6  specific basis.  I mean there could be inquiries about, you

7  know, a particular borrower who lost his job or, you know,

8  got sick or something like that.  There are other kind of

9  loan-specific causation issues but that's not what we're

10 talking about here.  So with that caveat I think on a macro

11 level --

12         THE COURT:   Okay.  Yeah, on the macro it seems to

13 me he's going to do an expert and you'll have the time you

14 need to oppose it.  Isn't that the better way to do it?

15         MR. SHUSTER:   You know, he may not do an expert

16 except in rebuttal to my affirmative experts.  So I may not

17 get an affirmative expert --

18         THE COURT:   What if I promise you a rebuttal to

19 whatever the expert gives on the macro point?

20         MR. SHUSTER:   That would be very helpful and I

21 think that would be fair.

22         THE COURT:   All right.  So we can either do it

23 with that he has to give that expert report the same time

24 you give yours or we'll build in a rebuttal period.

25         MR. SHUSTER:   I think it would be fairer if

40

1
2  they're going to address this to have them address it in
3  their affirmative expert reports.  They styled it as an
4  affirmative defense.  If it is a truly an affirmative
5  defense, right, they would have the burden.  They'd have to
6  put in an affirmative --
7          MR. WOLL:   I guess by the --
8          THE COURT:   It's right there in black and white,
9  isn't it?
10          MR. WOLL:   I guess by the same token, Your Honor,
11  plaintiff is going to seek damages in a way that it would be
12  required under applicable law to prove causation, which is
13  normally the plaintiff's burden, then they should put in an
14  affirmative report on their causation argument at the same
15  time.
16          MR. SHUSTER:   Lost causation is not an element of
17  any claim that we're asserting.
18          THE COURT:   Well let's do one thing at a time.
19  So what we've established is you're going to -- the issues
20  raised by the seventh affirmative defense are going to be
21  part of an expert report.  They'll have a chance to rebut
22  it.  Our presumption now is that you'll serve it at the time
23  the plaintiff serves their expert reports, though that can
24  be revisited if we feel it's appropriate.  But in any event,
25  we would give the plaintiff a chance to rebut it.

41

1

2          MR. SHUSTER:   So, thank you, Your Honor.   Topic

3    14 which is the (indiscernible) affirmative defense, they

4    say we committed material breaches of the agreements.

5    Again, I truly don't know what they're referring to and I'd

6    like to.

7          THE COURT:   Well this is one of these things that

8    I don't feel is an affirmative defense at all but you did

9    put it in there.   Are you going to be seeking some jury

10   instruction on this or do you think this is part of their

11   burden or what?

12         MR. WOLL:   Your Honor, I think as a general

13   category, certainly one thing that falls into this bucket,

14   is that the trustee had certain prompt notice obligations

15   and there are disagreements about when those kick in.   But

16   to the extent the trustee was obligated on the contract to

17   provide prompt notice and failed to do so, that's certainly

18   an example of a material breach.

19         I agree with you, that's an element of the

20   plaintiff's claim.   It's not really an affirmative defense.

21   We listed it as belt-and-suspenders, but.

22         THE COURT:   Okay.   Well so now you're giving me

23   an example of material breach which is helpful.   Any others

24   that you know about?

25         MR. WOLL:   I'm sure there -- I'm sure there are

42

1    others.  I'm sure there are many but, yeah, yeah.

2        THE COURT:  See, I don't -- this is the kind of
3    thing, again, my only issue is I don't want things to come
4    up that cause people to say, you know what, if I'd known
5    that that was your factual contention I would've taken
6    discovery on that.  I would have asked some question of a
7    witness on that.

8        So that's what they need assurance on and I think
9    that, you know, now that we're out of an expert field this
10   may go to an area where they should get a contention
11   interrogatory, you know, earlier in the case.  If you know
12   some material breaches now, like what you just said, that
13   you should respond to it and you could supplement later,
14   again, through an interrogatory.  What's your view on that?

15       MR. WOLL:  I think that's fine, Your Honor,
16   subject to supplementation since we haven't, you know,
17   finished discovery.

18       THE COURT:  Okay.  This is one you should answer
19   if they serve you a contention interrogatory.  And again,
20   you don't have to -- I don't want a contention interrogatory
21   that requires anybody to marshal evidence; it's just to
22   state the factual contentions that support the defense.

23       So if you want to serve that now and see what you
24   get in 30 days that seems to me fair.

```
 1
 2            MR. WOLL:   Very good.
 3            MR. SHUSTER:   So the topic number 15, the intent
 4  affirmative defense failed to mitigate minimize their
 5  employee damages.
 6            THE COURT:   Well this is your -- this certainly
 7  is an affirmative defense, as I recall.  I mean at least I
 8  haven't seen it in this context but generally mitigation is
 9  a defendant's burden.
10            So I think once again, following my paradigm, if
11  they want to serve you a contention interrogatory now that
12  says state your factual contentions that support this, you
13  should be required to answer it, if you have any answers,
14  understanding you could supplement them later.
15            MR. WOLL:   That makes sense to me, Your Honor.
16  Thank you.
17            THE COURT:   Next?
18            MR. SHUSTER:   The next affirmative defense I must
19  say really doesn't sound like an affirmative defense.  I
20  mean, it's topic number 16.  It's the 11th affirmative
21  defense and it says our claims are barred to the extent any
22  breach does not materially or adversely affect the value of
23  any loan.  You know, that's straight out of the contractual
24  language so --
25            THE COURT:   Saying you can't prove your case.
```

1

2          MR. SHUSTER:   Right.

3          THE COURT:   I'm less inclined to require them to

4  explain that, though I would require them to say they're not

5  seeking a jury instruction on it.  It would sort of force

6  them to say this is not an affirmative defense and which

7  we're seeking a jury instruction.  Either that or they have

8  to give the factual contentions.  So if you want to add that

9  now to your list and let them say one or the other, that

10  would be fine with me.

11          MR. SHUSTER:   The one thing that, you know,

12  they're staking out a view, I would like to hear from either

13  a 30(b)(6) witness or by a contention interrogatory what

14  they mean by materially and adversely affect the value of

15  the loan.  They may have a factual understanding of that

16  firm, I know they do, and if they can, you know, flush that

17  out in a contention interrogatory I'd like to know what

18  facts they're going to -- the category of the facts, the

19  nature of the facts they're going to try to marshal on that

20  point.

21          THE COURT:   Mr. Woll, are you prepared to answer

22  that?  Not now, but in an interrogatory.

23          MR. WOLL:   I think, you know, subject to how Your

24  Honor addressed the other issues, I think we'd be prepared

25  to answer this in an interrogatory subject supplementation.

45

1

2  I believe we've asked the plaintiff for a similar

3  interrogatory and I apologize.  I don't remember whether

4  you've agreed to provide that answer or not.  But I assume

5  that if we're serving these types of contention

6  interrogatories on each other then both sides need to

7  respond.

8           THE COURT:   Well maybe.  I mean, you're in a

9  little different position because you put in defenses

10 without putting in any factual allegations, unlike the

11 plaintiff who had to bear its soul and state what its

12 factual allegations are.  So you're kind of in a different

13 position.

14          And again, I'm not requiring anyone to marshal

15 evidence at this stage, just to give the factual contentions

16 that support it.  Plaintiffs have done that in their

17 complaint so you're not in a parallel position.  Just be

18 aware of that.

19          MR. WOLL:   Fair enough, Your Honor.  I mean, with

20 respect to the, kind of, the conceptual approach to

21 determine material and adverse affects --

22          THE COURT:   Oh, on that -- this last point, yeah,

23 I'm not quite sure what this is about, but if you guys want

24 to try.  If they're making the same -- are they making

25 claims about material and adverse effects?  I don't know.

1                                                          46

2              MR. WOLL:   That's part of it.  They are alleging

3    that they were material and adverse effects.

4              THE COURT:   Well you guys want to maybe talk to

5    each other at first and see if you want to try contention

6    interrogatories on that, then maybe there's some mutuality.

7              MR. WOLL:   Gotcha.  Thank you.

8              MR. HULTMAN:   The one difference is, of course,

9    we flushed that out in our breach notices and in our

10   complaint.

11             THE COURT:   Okay.  Well that may be your answer.

12             MR. SHUSTER:   So the next one, topic 17, the 15th

13   affirmative defense asserts that any alleged hard suffered

14   by the plaintiff is the result of the conduct of third

15   parties.  Again, I don't think that's a valid affirmative

16   defense --

17             THE COURT:   Sounds kind of like the seventh

18   affirmative defense, expect instead of being macro economic

19   forces it's actual entities.

20             MR. SHUSTER:   Right, but I would like to know

21   what third parties and what conduct, at least in general

22   term, could be a defense to the claims here.

23             THE COURT:   Well I think this is one of those

24   that a contention interrogatory which gives you facts as you

25   know them now would be appropriate.  This is not going to be

                                                        47

1

2      an expert issue; this is a factual issue.

3              MR. WOLL:   I think that -- I think that's fine,

4      Your Honor.  Thank you.

5              MR. SHUSTER:   And then finally the assumption of

6      risk defense.  I'm not -- again, I question whether it's a

7      valid affirmative defense.  I could --

8              THE COURT:   Legally valid.

9              MR. SHUSTER:   Right.

10             THE COURT:   Not just whether it's affirmative;

11     whether it applies in any way.

12             MR. SHUSTER:   Correct, whether it can possibly

13     apply in new circumstances.  But to the extent we -- there's

14     any factual basis for this affirmative defense, I'd like to

15     know at least, you know, in some way what it is so that I

16     can address it if necessary.

17             THE COURT:   I think this fits into the previous

18     category.

19             MR. WOLL:   That's fine, Your Honor.

20             THE COURT:   Okay.

21             MR. SHUSTER:   So that's all the plaintiffs have.

22             THE COURT:   All right.  Anything else from your

23     issues before we go to the defendants?

24             MR. SHUSTER:   No, Your Honor, thank you.

25             THE COURT:   Well, the first one seemed easy

1

2   because all you were asking was to talk to the other side.

3   Is it too easy to say, sure, go ahead?

4        MR. WOLL:   Maybe it is that easy, Your Honor.  I

5   mean, the problem we have is that there's just been such a

6   very small number of documents produced by the plaintiff.

7   And we've tried to approach this in a few different ways in

8   terms of proposing additional custodians asking --

9        THE COURT:   Well, the number is not the issue, is

10  it?

11       MR. WOLL:   No, up to a point it's not; I totally

12  agree.  And maybe there is no issue but I just -- I feel

13  it's incumbent upon me to try to probe this as much as I can

14  and we just haven't gotten much in the way of satisfactory

15  responses.

16       And one of the -- I mean, two things that I guess

17  I would note, and one is we had proposed five different

18  custodians that they add to their lists that they didn't

19  agree to run search terms on.

20       For at least a couple of those custodians or one

21  of them, Doris Wang (phonetic), was over 200 -- there's like

22  270 entries on the privilege log.  So those are apparently

23  relevant documents that are being held on privileged

24  grounds.  So to tell us Doris Wang wasn't a relevant

25  custodian here, given the paucity of e-mails we've seen,

1

2   raises issues in our mind.

3          In fact, there's something like 151 HSBC

4   individuals, non-legal individuals, on their privilege logs.

5   And again, just because somebody's on a privilege log

6   doesn't mean that they're an adequate custodian but we are

7   concerned that we have not tapped into the right custodians

8   and the right search terms to get at the relevant materials.

9   I mean, there are no documents to speak of in terms of

10  evaluation of the securitizations or the mortgages.

11         I think there are going to be some documents

12  produced, and Mr. Shuster will correct me if I'm wrong, in

13  connection with communications with one of the certificate

14  holders.  But there's lots of information with respect to

15  communication with other certificate holders that haven't

16  been produced.

17         So I'm just concerned we haven't struck the right

18  custodian or search term balance to get what, you know, my

19  client needs to defend itself.

20         THE COURT:   And what do you want me to do?  I

21  mean, let me -- you're entitled to get detailed descriptions

22  from the plaintiff as to, you know, why they believe

23  custodians are appropriate and why people appeared on a

24  privilege log but wouldn't have any documents responsive or

25  shouldn't be searched.

50

1

2          So have you sat down and tried to get those

3   answers or not?

4          MR. WOLL:   Well, we've -- yes and no.  I mean, to

5   be honest with you in terms of going through the privilege

6   log and, you know, all these names I just mentioned, I

7   haven't had that specific conversation with Mr. Shuster and

8   I'm happy to do that.

9          We did propose some additional custodians and then

10  they said no.  And as I said, at least one them has --

11         THE COURT:   And gave you good reasons or not?

12         MR. WOLL:   Well, they said they weren't involved

13  or they were low-level employees.  But Ms. Wang, as I said,

14  has many entries on the privilege log which indicates some

15  level of relevant involvement, potentially.  So I know we

16  presented Your Honor with not a very clear, you know,

17  situation in terms of ordering something.  But maybe if it's

18  just to get a commitment from the plaintiffs that they will

19  work with us on this, because as I said, the paucity of e-

20  mails is very concerning to us.

21         MR. SHUSTER:   So I have to say I don't think we

22  needed the Court's intervention for us to commit to work

23  with them.  We've been prepared to meet and confer on this

24  issue and have met and conferred on this issue several

25  times.

We received an e-mail from Mr. Woll's team by just within the last day or so, asking us if we've completed our production.  And we told them that we're going to produce these additional sort of Amherst-related documents, I guess, because that is consistent with rulings and observations Your Honor made at the hearing on the subpoena to Amherst and agreements they've reached with Amherst counsel.

And beyond that, we've identified fewer than 20 additional documents on our privilege log or otherwise that we intend to produce.  There may -- you know, a lot of these people whose names area on the privilege log, it's because they were on a broad circulation of documents.

But we have done a lot of digging, of sitting down, of interviewing custodians to make sure that we're identifying the custodians who have relevant materials.

The trustee here -- and this is just a fact.  It's a fact under the documents and it serves a really, purely administrative function.  The trustee gets paid very little money every year and just -- it just had a completely different role in this transaction than Deutsche Bank did.

I'm, you know, even the witnesses, the custodians who did produce documents and who Deutsche Bank is going to depose, are going to be disappointing deponents for them because they just don't have a lot of knowledge that is

1

2   going to be useful or relevant.

3        But we've been prepared to meet and confer.  We

4   have met and conferred.  We're happy to do it again and I

5   don't think there ought to be any suggestion that we're in

6   any way derelict in our discovery obligations.

7        THE COURT:   Okay.  Well, the parties have an

8   obligation, obviously, to do a document production and to

9   give responsive documents, and to take the reasonable steps

10  needed to produce them.  Each side should be discussing with

11  other what they're doing to do that.  That should be out in

12  the open and not a secret.

13       Obviously if it comes to that, you can depose

14  people about where documents are kept, and who knows what.

15  That's the natural check on this, Mr. Woll.  You're going to

16  be deposing some of these people.  If it turns out that

17  there is documents they recall, or remember, or interactions

18  they had that weren't subject to the production, there's

19  going to be, you know, big trouble for the plaintiffs.  So I

20  have no reason to believe that they're not going to do all

21  they need to do to make sure that you get the responsive

22  documents.

23       But as I say, you're entitled to question them in

24  that.  I encourage you to discuss it further and if you

25  think that there is some further step that should be taken

53

1

2 that they're not, give me specifics and present it to me,

3 okay?

4          MR. WOLL:    Thank you, Your Honor, appreciate

5 that.   I think the last issue are interrogatories, Your

6 Honor.

7          THE COURT:    Okay.

8          MR. WOLL:    And we had -- we'd raised plaintiff's

9 refusal to answer three interrogatories -- interrogatory 6

10 which asks them to quantify the damages that they're

11 seeking; interrogatory 7 which asks them to identify the

12 purchase price, which is a defined term in the contract

13 which is relevant to the damages they're seeking; and the

14 third interrogatory asks them to identify the status of the

15 mortgage loans that they're suing at.

16          The response on the first two interrogatories,

17 which are essentially damages interrogatories, has been that

18 the plaintiff will address damages through its experts and

19 doesn't have to provide an interrogatory response at this

20 point with respect to its damages.

21          We think that that's incorrect and we've cited

22 cases to the effect that just because experts are going to

23 deal with damages doesn't mean that a party doesn't have to

24 answer interrogatories spelling out a --

25          THE COURT:    What are you concerned about?   What

1                                                              54

2   is this interrogatory -- I'm not saying you're not entitled

3   to it, but I'd like to talk practicalities, because there

4   were different factual situations in these other cases.

5              MR. WOLL:   Sure, mm-hmm.

6              THE COURT:   What is it you're concerned about

7   that if you had to wait until you got an expert that

8   specifically said with damage amounts, explain to me what's

9   the prejudice to you?

10             MR. WOLL:   Well, Your Honor, I think that

11  knowing, you know, the numbers are important obviously, but

12  more than the numbers I think it's the way that the

13  plaintiff arrives at the numbers.  And so as we said, the

14  purchase price is a defined term and of -- under the

15  agreement and how they're deriving the --

16             THE COURT:   I'm sorry.  And just since I'm

17  ignorant about this what does purchase price mean in this

18  context?

19             MR. WOLL:   So the purchase price is part of what

20  needs to be paid by DBSP in connection with the repurchase

21  of a loan essentially.

22             THE COURT:   When it originally --

23             MR. WOLL:   No, in connection with a repurchase

24  demand so --

25             THE COURT:   Oh, oh, when the plaintiff says to

1

2  DBSP you need to repurchase these loans because they're bad,

3  is that what you're talking about?

4          MR. WOLL:   Exactly.  Then the purchase price goes

5  into that contractual calculation of --

6          THE COURT:   The purchase price is what price

7  exactly?  The price that you do what with?

8          MR. WOLL:   Well it's a defined term which I can't

9  recite off the top of my head.  But it's essentially a

10 component of what DBSP would have to pay to repurchase the

11 loan, so it's --

12         THE COURT:   Pay to whom?

13         MR. WOLL:   To the trustee --

14         THE COURT:   To HSBC.

15         MR. WOLL:   Right, yeah.

16         THE COURT:   The plaintiff here.

17         MR. WOLL:   Right.  So it's a component of their

18 damages.  And the manner in which they calculate those

19 damages under the contract is important to --

20         THE COURT:   I thought what you were getting at,

21 and I was going to agree with you, is that maybe you don't

22 need to know the exact numbers, but you need to know the

23 categories, as it were, damages.

24         So if you know the purchase price is part of it

25 and it's apparently a defined term, aren't you at this point

1                                                                    56

2  essentially asking for the numbers?  What more do you need?

3           MR. WOLL:   Well I think that maybe disputes as to

4  how purchase price is calculated and I think there are also

5  additional damages that they are claiming, which we talked a

6  little bit about before in my context of causation.  So it

7  is for the most part about how they are deriving the

8  numbers.  We think they should give us the numbers too.  But

9  knowing how they are calculating their damages or going to

10 allege damages could affect discovery, could affect, you

11 know, settlement discussions.  We think it's just something

12 that, you know, subject to supplementation they should be

13 able to tell us now.

14          THE COURT:   All right.  I mean can you give -- I

15 gather the thing you can't do is give numbers.  But can you

16 give, sort of categories or some indication of calculation

17 of damages now?

18          MR. SHUSTER:   We could probably identify elements

19 of damages but we don't have -- we literally do not have

20 numbers.  Elements of damages, I don't think frankly how

21 useful it will be, but.

22          THE COURT:   That's the problem.  Why don't you

23 take a crack at it?  You know, we do have this local rule

24 that has this concept that defendant should be put on notice

25 of categories, I think is the rule, the language I can't

1                                                    57

2  remember, of damages.

3            I'd like to do something that does that for him.

4  And then if you need to say we cannot do the numbers until

5  our expert gives us numbers, say that.  And then if you

6  think you're entitled to more come back to me.  Let's see

7  what they come up with.

8            MR. WOLL:  Okay.  Fair enough, Your Honor.  And

9  then the third interrogatory had to do with the status of

10  the loans.  I mean the trustee has information about the

11  performance of the loans, whether they're in liquidation or

12  not and --

13            THE COURT:  Isn't that coming up in discovery or

14  not?

15            MR. WOLL:  Well it is part of discovery.  That's

16  why we're --

17            THE COURT:  No, but I just assume there was some

18  very obvious document for each loan that says what the

19  status is.  And you're getting it and it would be a complete

20  waste of time for them to repeat it in an interrogatory

21  answer.  Am I wrong on that?

22            MR. WOLL:  Well we may get documents that have

23  that information and I guess if they do have a document that

24  shows that and they want to --

25            THE COURT:  That organizes it.  Do you have

58

1

2  happen -- is it a burden to you to organize that or have you

3  not already done it?

4          MR. SHUSTER:   So the trustee actually does not

5  monitor the status of the loans and maintain information.

6  Reports are prepared by the servicer.  Either the servicer

7  or the master servicer, under the pooling and services

8  agreement, those reports are available on a website that I'm

9  quite confident Deutsche Bank has.

10          THE COURT:   That's the only place you could get

11  this from?

12          MR. SHUSTER:   That's where we would go.

13          THE COURT:   All right.  Well it's a waste of time

14  to make them do this so feel free to look at that.

15          MR. SHUSTER:   Okay.

16          THE COURT:   Anything else from the defendant?

17          MR. WOLL:   I believe that was it, Your Honor.

18          THE COURT:   Okay.  So the plan now is that at

19  some point in the near future you're going to propose a

20  schedule.  What date would you like me to give you to submit

21  that to me?

22          MR. SHUSTER:   So the only issue I have with

23  fixing a schedule is the disputer over privileged documents

24  is actually meaningful.  It's a large volume of material and

25  --

```
 1                                                         59

 2            THE COURT:   Are we going to be holding up

 3   depositions while we do this?

 4            MR. SHUSTER:   You know, I don't know yet what to

 5   do about it.   We've held up depositions on -- we've held up

 6   depositions pending the defendant's production of these

 7   additional materials that we dealt with in issue 1.   And so

 8   those are supposed to be produced by July 31.   But a lot of

 9   those materials, I think, they're claiming privilege over or

10   they've redacted.   So I honestly wasn't anticipating that we

11   would have a briefing schedule that extends out beyond that

12   date and --

13            THE COURT:   I hope you don't blame me for this.

14            MR. SHUSTER:   No, no, but you know, until we know

15   -- which I'm not asking -- you know, until we have a ruling

16   from the Court and then there is a production, if assuming

17   the best for us pursuant to that ruling, you know, it feels

18   to me like we probably won't get a ruling.   And then a

19   production until around October 1 or, you know, best-case, I

20   mean it's submitted August 24th.

21            THE COURT:   I think a ruling October 1 is best-

22   case, but.

23            MR. SHUSTER:   So I don't know where that would

24   be, you know, honestly, I don't know where that leaves us on

25   whether we think we can do any depositions before that and
```

```
 1
 2  do a schedule, just candidly.  We can think about it.  If we
 3  could have a couple of days to think about it, maybe to talk
 4  about it, and then send Your Honor a letter and say we
 5  either are or aren't able to propose.
 6          THE COURT:   I'm not saying you should propose one
 7  now.  My plan had been to have you propose one to me later.
 8  But maybe what you're saying is you haven't even thought
 9  about whether you should do depositions before the ruling on
10  the -- before the ruling on the privilege.
11          MR. SHUSTER:   Right.  In light of the schedule
12  today on the briefing I'd at least like to go and think
13  about it.  Why don't we say that we'll come back to the
14  Court within no later than two days and address the
15  scheduling issue together, one way or the other.
16          THE COURT:   I'm not in a rush, so.
17          MR. SHUSTER:   Okay.  So --
18          THE COURT:   Is there a cutoff right now?
19          MR. WOLL:   September --
20          MR. SHUSTER:   There is; it's September 15th.
21          THE COURT:   Okay.  So before then so --
22          MR. SHUSTER:   Okay.  So we'll send something to
23  the Court before then and thank you, Your Honor.
24          THE COURT:   Okay.  Anything else, Mr. Woll?
25          MR. WOLL:   No, that's it, Your Honor, thank you
```

1

2  very much.

3          THE COURT:    Thank you.

4              (Whereupon the matter is adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                                      62
 2                     C E R T I F I C A T E
 3
 4          I, Carole Ludwig, certify that the foregoing
 5   transcript of proceedings in the United States District
 6   Court, Southern District of New York, Ace Securities Corp.
 7   Home Equity Loan Trust, Series 2007-HD3 v. DB Structured
 8   Products, Inc., 13cv1869 was prepared using digital
 9   electronic transcription equipment and is a true and
10   accurate record of the proceedings.
11
12
13
14
15   Signature_____
16
17   Date:   July 13, 2015
18
19
20
21
22
23
24
25
```